## LIGGINS v. UNITED STATES.

(Court of Appeals of District of Columbia. Submitted December 4, 1923. Decided April 7, 1924.)

No. 4023.

1. **Homicide ⬳268—Evidence authorized refusal to direct acquittal.**
   In a prosecution for murder in the second degree, evidence that, during a struggle between defendant and his sister, defendant shot twice in the same general direction, and the second shot killed defendant's sister-in-law, *held* to authorize a refusal to direct an acquittal.

2. **Homicide ⬳9—Whether defendant had purpose in shooting held immaterial.**
   Where evidence of a shooting tended to show malice aforethought, whether defendant had a definite purpose of shooting any one is immaterial.

3. **Criminal law ⬳24—Homicide ⬳146—Intent of probable consequences presumed; use of dangerous weapon evidence of malice aforethought.**
   Every person is presumed to intend the natural and probable consequence of his own act, and the use of a dangerous weapon, resulting in a homicide, by one having no right to use the weapon, in the absence of mitigating facts, is evidence of malice aforethought.

4. **Homicide ⬳146—Depraved, wicked, and malicious spirit may be inferred from acts committed.**
   A generally depraved, wicked, and malicious spirit, a heart regardless of social duty, and a mind deliberately bent on mischief may be inferred from the acts committed.

5. **Homicide ⬳11—Proof of motive not essential.**
   Proof of motive is not essential to establishment of malice.

6. **Criminal law ⬳553—Contention that testimony should be disregarded on the ground of physical impossibility held without merit.**
   Where witness testified as to what occurred in a kitchen, and stated that the door was open about seven inches, a contention that her testimony should be disregarded, because it was physically impossible to see into the kitchen with the door open only seven inches, *held* without merit, as it could not be expected that she would have a nice appreciation of the exact size of the opening.

7. **Homicide ⬳174(9)—Flight and statement of witness that defendant did the killing held admissible.**
   Testimony of a witness' statement, made shortly after the crime was committed, that defendant did it, and of defendant's immediate flight, *held* admissible.

8. **Homicide ⬳236(1)—Contention that caliber of defendant's revolver and of bullet in decedent's body was not same held without merit.**
   Where the evidence tended to show that the fatal bullet came from defendant's revolver, a contention that the government failed to prove that the caliber of defendant's revolver is the same as the evidence tended to show was the caliber of the bullet found in decedent's body *held* without merit.

---

⬳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
297 F.—56

Appeal from Supreme Court of the District of Columbia.

George Raymond Liggins was convicted of murder in the second degree, and he appeals. Affirmed.

T. Morris Wampler, of Washington, D. C., for appellant.

Peyton Gordon and J. H. Bilbrey, both of Washington, D. C., for the United States.

Before ROBB and VAN ORSDEL, Associate Justices, and BARBER, Judge of the United States Court of Customs Appeals.

BARBER, Acting Associate Justice. Appellant Liggins, the defendant, was tried and convicted upon an indictment charging him with murder in the second degree. At the conclusion of the government's opening case the defendant moved for a directed verdict, upon the ground that there was not sufficient evidence to warrant submitting the case to the jury. This motion was denied, subject to defendant's exception. No further testimony was offered, and the case submitted to the jury, who returned a verdict of guilty. The record shows a question as to the admission of evidence, which will later be referred to.

The homicide occurred in a house in this city about midnight, May 7, 1922. In the house there were two rooms downstairs, one at the front, then in use as a sleeping room, and the other at the rear, used as the kitchen. There was at least one room upstairs; whether more the evidence does not disclose. A door opened from the front room into the kitchen, swinging toward the right into the latter room. The occupants of the house at the time of the homicide were George Liggins, the defendant, his wife, Effie, his daughter, Marjorie, about 10 years of age, his sister Irene, Maude Prince, the decedent, who was a sister of defendant's wife, her daughter, Selena Prince, and one Sam Matthews.

Selena, called as a witness for the prosecution, gave evidence of which the foregoing is a summary. With reference to the circumstances under which the homicide occurred she testified that she was sleeping in the kitchen, and about midnight heard a shot, ran upstairs, and in the room there saw the defendant and his wife struggling. Irene and Marjorie came into the room. Selena took Effie, the wife, and pushed her downstairs ahead of her; Marjorie following immediately behind. Irene grabbed the defendant at the head of the stairs. Selena, Effie, and Marjorie ran into the front room, where Maude, the decedent, was sleeping. Maude came out of the front room, met the defendant at the foot of the stairs in the kitchen, and asked him, "What is the matter?" He turned to her, whereupon she rushed back into the front room, slammed the door between it and the kitchen, and told him he was not coming in there. After being slammed, that door opened about 7 inches, so that the witness, who was standing in the front room, could see through the opening and into the kitchen. There she saw the defendant, with his hands above his head, and Irene struggling with him (using the language of the witness), "to keep him from shooting any more." The defendant had a pistol in one hand, and Irene had hold of his hands or wrists.

The door between the two rooms was then ajar from 6 to 12 inches, and the witness was standing in the front room near the door. While in this position the pistol was discharged, the bullet going up over the door. At that moment Maude Prince closed the door tightly, whereupon another shot was fired from the kitchen, which came through the panel of the door and struck Maude, who was standing at the door; the witness being on her left side. At the time there was no light in the front room. Maude, Effie, probably Marjorie, Matthews, and the witness Selena were in the front room at the time, and Irene and the defendant were in the kitchen. There was a light on the table in the kitchen, on the opposite side of the room from the door. Just before the shot was fired which struck the deceased, Selena heard struggling in the kitchen—considerable struggling or shuffling. Immediately after being hit, Maude ran out in front of the house and fell on the sidewalk. The defendant thereupon came out of the kitchen and went in front of the house, as did also the other occupants. Defendant stood for a moment or two near where the deceased fell. Shortly thereafter a policeman appeared upon the scene, whereupon the witness and Effie said: "He did it! He did it!" The officer said, "Who is it?" They pointed to the defendant. The officer then approached the defendant, who started to run across the street, and got within one step of the car track, when the policeman grabbed him. He was going at a pretty good running rate across the street.

Marjorie Liggins, called as a witness, gave but little testimony. She could not say from where the shot was fired, and did not remember whether or not there was any light in the kitchen; saw her mother give a pistol to the policeman out in front of the house, but did not know where her mother got it.

William H. Lester, the officer referred to, testified in substance that he heard the muffled cries of two or three persons, could not distinguish whether it was "Murder!" or "Police!" and two indistinct pistol shots. He immediately proceeded toward the house; saw a woman rush out the doorway and fall on the sidewalk. As he approached the scene, there were two women and a man struggling. He said: "Who did this?" The two women said: "He did it! He did it!" He could then see blood flowing from the side of the fallen woman's neck. The two women and man were the defendant, his sister, and wife. He saw a pistol or revolver "in the hands of the three in some way," the defendant having it by the hilt or handle. After the women said, "He did it!" the officer started for the defendant, who jumped back and ran across to the other side of the street. The witness pursued him, drew his gun, and said: "If you do not stop, I will shoot you." Thereupon defendant stopped, turned around, and said: "What are you going to shoot me for?" The officer replied: "Where is that gun?" Defendant answered: "What gun?" The officer said: "The gun you had in your hand a moment ago." The defendant then said: "I have not any gun." The officer then took the defendant back where the women were, saw the revolver lying by the side of the woman who had been shot, and picked it up. When opened, it was found to contain three empty shells, and two

that had not been fired. It was ultimately filed with the clerk of the court, made a part of the record, and transmitted to this court.

A physician, who performed the autopsy on the body of the decedent, testified that the body had a gunshot wound on the right side, about the middle of the neck, which severed the common carotid artery, and that a bullet of 38-caliber was found in the neck. He said the cause of death was a gunshot wound in the neck, hemorrhage, and shock.

The foregoing is in substance all the testimony offered in the case. Other than what is recited, there was no evidence tending to show any motive on the part of defendant to commit the homicide, or to indicate there was any ill feeling between him and any one in the house.

The charge of the court to the jury is incorporated in the record. No exception was taken thereto, and it is not now claimed that, assuming that it was proper to submit the case to the jury, there is any error therein. It may properly be said that it seems to contain a correct statement of the law applicable to the case.

The defendant claims:

(1) That the motion for the directed verdict should have been granted, because there was no substantial evidence to submit to the jury; the evidence was as consistent with an accidental killing as with an unlawful one.

(2) That the testimony of Selena Prince should have been disregarded, because it was a physical impossibility for her to have seen into the kitchen at all with the door open about 7 inches, basing this contention on the proposition that courts will not accept as true evidence inherently improbable, contrary to physical facts.

(3) That the testimony that witnesses said to the officer, "He did it!" indicating the defendant, was not admissible, as not a part of the res gestæ.

(4) That there was not sufficient proof of the corpus delicti, because the doctor who performed the autopsy testified that the bullet found in the neck of the decedent was a 38-caliber, while the officer testified that the revolver he obtained in the manner indicated by the recited testimony was a 32-caliber.

[1] In argument, defendant criticizes the government for not calling as witnesses defendant's wife, his sister, and Sam Matthews. As to this it is sufficient to say that no error is alleged in that behalf; no application was made to the court for an order upon the government to produce such witnesses; there is nothing to indicate whether or not they were within the reach of process, or, if they were, that it was not available to defendant.

We are unable to accept defendant's view that there was no substantial evidence to submit to the jury, or that it was as consistent with an accidental killing as with an unlawful one. The evidence tended to show that the defendant was in possession of a deadly weapon in a room adjoining that in which he must have known were his wife and her sister, as well as others, including his daughter, and into which room he had been told not to go. His sister was struggling with him, trying to prevent his shooting any more; yet, not-

withstanding this, not only one, but two, shots were fired, one toward, and the other into and through, the door giving entrance into that adjoining room.

[2] The suggestion of defendant's counsel that the evidence is as consistent with the conclusion that the fatal shot was fired while the defendant was trying to take the pistol from his sister Irene, to prevent her using it, as it is with the conclusion that he fired it, is wholly unwarranted. Irene had grabbed him at the head of the stairs. While the evidence does not definitely show why she did this, the inference is obvious. She had not been connected with the firing of the pistol upstairs, and her efforts in the kitchen were solely directed to prevent his shooting any more. He was not holding her hands above her head for that purpose, but she was his. Her subsequent conduct raises no inference of a consciousness of guilt on her part. If it might be presumed that the first shot in the kitchen was accidentally discharged toward the door, it is too great a stretch of credulity to believe that the second and fatal shot was accidentally discharged in the same direction. Whether the defendant had a definite purpose of shooting his wife, her sister, or any other person is immaterial, provided the evidence tended to show malice aforethought in the shooting.

[3] What is malice aforethought has been the subject of judicial attention and definition in a great number of cases unnecessary to cite. Every person is presumed to intend the natural and probable consequences of his own act, and the use of a dangerous weapon, resulting in a homicide, by one having no right to use the weapon, and in the absence of mitigating facts when he did use it, is always regarded as evidence of the existence of malice aforethought. Allen v. United States, 164 U. S. 492, 17 Sup. Ct. 154, 41 L. Ed. 528; Hickory v. United States, 151 U. S. 303, 14 Sup. Ct. 334, 38 L. Ed. 170; Patten v. United States, 42 App. D. C. 239; Travers v. United States, 6 App. D. C. 450.

[4] The evidence in this case does not tend to show that the defendant had any right to fire the revolver into the room where the decedent and others were, nor does it tend to show any facts which mitigate such conduct. It clearly tends to establish that, whether or not he had any special malevolence toward any particular individual, he was possessed of a "generally depraved, wicked, and malicious spirit, a heart regardless of social duty, and a mind deliberately bent on mischief," which has been held to be embraced by the term "malice aforethought," and which may be inferred from the acts committed. Allen v. United States, supra; Thiede v. Utah Territory, 159 U. S. 510, 16 Sup. Ct. 62, 40 L. Ed. 237; 29 Corpus Juris, 1087, note 60. If any doubt could otherwise arise as to whether or not the defendant did the shooting with sufficient premeditation to constitute malice aforethought, the fact that he fired the first shot from the kitchen in the same general direction as the second tends to supply that element.

[5] It is urged that no motive is shown in this case. The law is settled that proof of motive is not essential to the establishment of malice. 29 Corpus Juris, 1087; Pointer v. United States, 151 U.

S. 396, at page 414, 14 Sup. Ct. 410, 38 L. Ed. 208; Lanckton v. United States, 18 App. D. C. 348. We hold that the evidence in this case clearly tended to establish all the elements of the crime of which the defendant was convicted, and the court could not have directed a verdict of not guilty consistently with the principles that underlie the system of trial by jury. Burton v. United States, 202 U. S. 344, 26 Sup. Ct. 688, 50 L. Ed. 1057, 6 Ann. Cas. 392.

[6] The contention that the evidence of Selena Prince should have been disregarded, because it was a physical impossibility for her to see into the kitchen at all with the door open "about 7 inches," is fallacious. She testified in the same connection that it was open so that she could see into the kitchen, that she did so, and told what she saw. It could hardly be expected under the circumstances that she would have a nice appreciation of the exact size of the opening. It is perfectly clear that she could see into the kitchen to some extent, and it was for the jury to find what the facts were, in view of the attending circumstances as shown by the evidence. The cases cited by the defendant upholding the rule he invokes as to her testimony, on examination, disclose a state of facts vastly different from those in this case. We do not think her testimony was contrary to the physical facts in this case or inherently improbable.

[7] The government does not contend that the statement of witnesses in the presence of defendant that "he did it," indicating the defendant, is part of the res gestæ, but urges that it was admissible in connection with what the defendant did when he was charged with the shooting. While the flight of an accused raises no presumption of law that he is guilty, it is admissible in evidence as a fact, to be considered by the jury in connection with other circumstances, and for the same reasons the circumstances connected with such flight are likewise admissible. Allen v. United States, 164 U. S. 492, 499, 17 Sup. Ct. 154, 41 L. Ed. 528; 16 Corpus Juris, 551.

[8] There is no merit in the contention of the defendant that the government has failed to prove that the caliber of the revolver is the same as the evidence tended to show was the caliber of the bullet found in the body of deceased. The evidence tended to establish that, whatever its caliber, the fatal bullet came from a revolver fired by the defendant.

The judgment below is affirmed.