105 F.2d 21 (1939)
McAFFEE
v.
UNITED STATES.
No. 7071.
United States Court of Appeals for the District of Columbia.
Decided March 28, 1939.
Petition for Rehearing Denied April 5, 1939.
*22 *23 Robt. I. Miller and Joseph A. McMenamin, both of Washington, D. C., for appellant.
David A. Pine, U. S. Atty., and Charles B. Murray, Asst. U. S. Atty., both of Washington, D. C.
Before GRONER, Chief Justice, and STEPHENS, MILLER, EDGERTON, and VINSON, Associate Justices.
STEPHENS, Associate Justice, with whom concurs MILLER, Associate Justice. GRONER, Chief Justice and EDGERTON and VINSON, Associate Justices, concur in part and dissent in part, as below indicated.
The appellant, hereinafter for convenience referred to as the defendant, was convicted in the District Court of the United States for the District of Columbia of the crime of murder in the first degree. From the judgment of the court sentencing him to death, this appeal was taken.
The defendant was charged with the murder of Mrs. Henrietta B. Anderson. The facts disclosed by the evidence are substantially as follows: Mrs. Anderson lived in an apartment at 1633 L Street, N. W., in Washington. The defendant was a janitor in the apartment building. At about 6 o'clock on the afternoon of Sunday, August 22, 1937, Mrs. Anderson's body was discovered in her apartment by her niece. The back of her head had been crushed by blows, apparently inflicted by some hard blunt instrument. Examination by the coroner revealed that Mrs. Anderson had been intoxicated just before her death. Friends summoned by the niece went immediately to the basement quarters where the defendant lived, and found him in a drunken sleep. The police were notified, arrived shortly thereafter, and took the defendant to the precinct station house. There, though still quite drunk, he was able to give answers to questions which the officers put to him, and he gave them names of various acquaintances of Mrs. Anderson who he said had recently visited her. Officers then went to different parts of the city and brought in several persons for questioning. At about 5 o'clock on the following morning, August 23, one of the officers accused the defendant of giving misleading information, and then for the first time the defendant was accused by this same officer of committing the crime himself. The defendant buried his head in his hands and said: "Yes, this is terrible. I did it because she was chasing me with an ice pick." He told this officer and two others than he was jealous of Mrs. Anderson's attention to a "fat man" who came to the house, and that he had told her that before she married that man he, the defendant, would kill her. He also said he had taken the shaker off the furnace in the basement of the apartment building, had gone upstairs and struck and killed Mrs. Anderson with it while she lay on the couch in the front room of her apartment, and had then taken the shaker back and put it upon the furnace again. After he made this statement, the defendant was taken to the apartment house, where the officers found a shaker on the furnace in its proper place. It was free of dust, while the rest of the furnace was dusty. The defendant explained to the officers that he had washed the shaker with a cloth to get the blood off of it, and he identified as the cloth one which the officers found in the set tubs in the basement. This cloth had spots on it which, upon a scientific test later made, proved to be blood spots. Examination of the shaker showed it also to be blood-stained, the washing which it had received having been insufficient to eradicate the stains. Blood stains were found also upon the steps leading from the hall in the apartment house to the basement quarters, and upon the wall and doors of those quarters. The trousers and other clothing of the defendant were blood-stained, as were the backs of his hands; and scrapings taken from under his fingernails contained blood.
After the visit to the apartment house, the defendant was taken to police headquarters and there, about thirteen hours after the arrest, he made and signed a written confession, embodying in substance the statements he had made orally. The written confession was as follows:
"I have been knowing Henrietta Anderson for about two years and I have been going with her that long. Me and her fell out on account of Annie May Johnson, 212 Ivey St., Rocky Mount, North Carolina. She is a school teacher. I told Miss Anderson that I would give up Annie May if she would give up the tall man. Last Thursday, August 19, 1937, Miss Anderson went down to the beach and stayed out all night and me and her got to fighting the next day, Friday. She stayed home all day Friday drunk. I fell out again Yesterday. *24 I said that I wanted to go down town and she told me that I was going nowheres. I was in front of 1633 L Street, N. W., and then I went over to the garage across the street and she came out with an ice pick and called me and she went over and talked with the little lady who had the baby and then I went down to the cellar of 1633 L Street, N. W. Then she came home and me and her got to fussing again and I hit her with my fist.
"She followed me down the cellar with the ice pick and that is where I got the crow-bar or shaker and then me and her goes upstairs and she laid on the bed and told me I was going to bed with her and I tells her I wasn't and then I hits her over the head with the crowbar twice and she was on the bed at the time. I was standing by the bed. The first time I hit her with it she turned over and then I hit her again and I don't remember hitting her more than twice with that crow bar, or shaker. Then I left her and went on downstairs with the shaker and washed it off in the set tub and I put the shaker back on the furnace and then I went to bed. That's all I know about it."
This confession was admitted in evidence. We state below further facts pertinent to the particular questions involved in the appeal.

I
It is asserted by the defendant that under the evidence the written confession was so clearly not voluntary that it was the duty of the trial judge to exclude it. Under the law and practice in this jurisdiction, the duty of a trial judge in respect of an offered confession is first on voir dire to determine whether or not there is evidence upon which the confession might be held to be voluntary. If he concludes there is no such evidence, then he must exclude the confession from the case. But if, in his view, there is evidence from which it might be held to be voluntary, he must admit it in evidence and submit it to the jury under proper instructions. Brady v. United States, 1893, 1 App.D.C. 246; Hardy v. United States, 1893, 3 App.D.C. 35; Davis v. United States, 1901, 18 App.D.C. 468; West v. United States, 1902, 20 App. D.C. 347; Lorenz v. United States, 1904, 24 App.D.C. 337; Murray v. United States, 1923, 53 App.D.C. 119, 288 F. 1008; Wilson v. United States, 1896, 162 U.S. 613, 16 S.Ct. 895, 40 L.Ed. 1090.
The following circumstances are urged by the defendant as proving that the confession was involuntary: The defendant was a negro janitor about seventy years of age. He had been drunk for several days preceding August 22  the day of the homicide; he was drunk when he was arrested and was drunk a good part of that night. When first awakened, upon being taken into custody in the basement of the apartment house where the homicide occurred, he was forcibly assisted up the stairs. During the night, he was so drunk and sleepy that whenever questioned he had to be awakened. He was questioned by many different officers and at many different times during the night. Around 9 o'clock on the evening of August 22, three officers and three doctors and some others questioned him. At about 12 o'clock midnight he was questioned for an hour. Commencing at about 5 o'clock on the morning of August 23 he was questioned for two hours. He apparently got little continuous sleep during the night. The officers were "attempting to extract from the defendant names of the deceased's associates." The defendant's clothes were taken away from him during the night and he was taken out to the scene of the homicide in the rain, in a pair of pajamas or underdrawers, and was cold and wet. He was given a drink on this account. He was at least twice, and possibly three times, taken to the scene of the killing. On the first such occasion the body of the deceased was still in the room where she was killed. The defendant talked in a rambling manner during the night. When he was confronted with inculpatory inconsistencies and was accused of the crime and said "Yes, this is terrible. I did it because she was chasing me with an ice pick," and again when he signed the written confession, he was in a very nervous and high-strung condition. On both of these occasions he was apparently coming out of a drunk or a "hang-over." In the middle of the morning of August 23, the day after the homicide, the defendant was still nervous and had the appearance of one who had been intoxicated for some time and was coming out of the intoxication.
To the contrary, the following circumstances are by the Government said to prove that the confession was voluntary: No scheme of organized questioning was carried out with the intent to obtain a confession. *25 The apparent purpose of the police in questioning the defendant was to obtain information concerning the homicide, in order to apprehend whoever it developed had committed it, rather than through organized questioning to compel the defendant himself to confess.[1] The defendant was not threatened or struck or given any promise of leniency or any inducement to confess. He was advised that his statements would be used against him. He made no complaint during the night of insufficient sleep  indeed no complaint about anything except that his whisky had been stolen. Though he took the witness stand at the trial, the defendant did not even then complain that the confession had been extorted from him, or that he had in any way been mistreated.
In the Federal courts, the requisite of voluntariness in a confession is not necessarily satisfied by the fact that the confession is not induced by a promise, threat or actual blows or mistreatment physically inflicted. A confession may be involuntary if the circumstances, of whatever nature, are such as make it the result of the subjection of the will of the one confessing to that of another. Wan v. United States, 1924, 266 U.S. 1, 45 S.Ct. 1, 69 L.Ed. 131; Perrygo v. United States, 1924, 55 App.D.C. 80, 2 F.2d 181. But the mere fact that a confession is made while the one confessing is in the custody of police officers will not vitiate it. Wan v. United States. In respect of the voluntariness of a confession, each case must be judged upon its own facts. Bram v. United States, 1897, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568.
Chief Justice Groner and Associate Justices Miller, Vinson and I are of the view that, under the law as above set forth and under the evidence pertinent to the question whether or not the confession was voluntary, the trial judge properly admitted the confession in evidence. Associate Justice Edgerton dissents from the foregoing statement of the law in respect of the duty of a trial judge when a confession is offered in evidence, and from the statement of the law in respect of the definition of an involuntary confession. He further dissents from the conclusion that the confession was properly received in evidence, his view being that it should have been excluded.

II
The defendant contends that the instructions given by the court to the jury upon the subject of the confession were defective in that they did not make clear that if the jury found the confession involuntary they must disregard it. Two contentions were made in the case by the defendant's counsel with respect to the confession: one, that at the time the confession was made, he was so intoxicated that he did not understand the meaning of the questions or what he was saying and doing in answering them and making the confession; the other, that the confession was not voluntary. On these two topics the court instructed the jury as follows:
"Now, on this question of evidence, I shall call your attention to the law governing the subject of confessions. The Government has offered and I have admitted in evidence a statement signed by the defendant around eight o'clock on the morning of Monday, after the death of Mrs. Anderson.
"You are instructed that in considering whether the alleged confession or confessions were voluntary or not, you should consider the relation of the parties, the conversations between the officers and the defendant, if any, the time and place when the alleged confession or confessions took place, the physical condition of the defendant, and all the circumstances surrounding its making.
"Now, if a confession is freely and voluntarily made by a person accused of crime, that confession is evidence of great importance, because ordinarily a man does not admit that he has committed a crime unless that admission is true.
"The defendant contends that at the time this statement was made the defendant was so far under the influence of intoxicating liquors that you should not consider that confession. So I will state to you in some detail the law on that subject.
"If you find that at the time the statement was made the defendant was so much under the influence of liquor as not to understand what he was saying, then you should disregard the confession altogether. *26 If you find he was so drunk at that time that he did not know what he was doing, and was not in a condition to understand the questions put to him and his answers, then you will disregard the confession entirely.
"But if you find from the testimony that even though the defendant was intoxicated at that time, or had been intoxicated and had what one of the witnesses referred to as a hangover at the time he made the confession, but if you find he understood the meaning of the questions put to him and understood what he was doing, then the confession is admissible in evidence and it would then be one of the pieces of evidence for you to consider.
"Now, I think I have made that plain to you. The question first for you to decide on the question of that confession is, was this defendant in such mental condition that he understood the questions put to him and understood the answers he was making? If so, then the confession is admissible in evidence and you may consider it.
"If you find he was so intoxicated that he did not understand the questions, he didn't understand his answers, then you must not consider it at all.
"Now, if you find that it is something he understood, then you are to consider it; but the weight you will give to it, if you find it shall be considered by you, is entirely for you to determine. I cannot tell you how much weight you should give that testimony any more than I can tell you the weight you shall give to any other piece of testimony. It will then be for you, if you find that he understood what he was doing, to give it such weight as you think it is entitled to receive." [Italics supplied]
It will be noted that at no place in these instructions are the jury in express terms told that if they find the confession to be involuntary they must disregard it. This is but implied in the first italicized paragraph. While some reliance may be placed by a trial judge upon the capacity of a jury to understand the implications of instructions, nevertheless both of the parties to the cause are entitled to have the jury clearly informed on the whole of the instructions as to the law covering their respective theories of the case, there being evidence to support each theory. And Associate Justice Miller and I think that when the first italicized paragraph of the instructions is examined in connection with the balance of the instructions, it could have had but little effect, if any, in informing the jury of their duty to disregard the confession unless they found it voluntary. Indeed, we think that despite the giving of the instruction referred to, the jury must on the whole of the instructions have thought they had no problem before them as to the voluntariness of the confession, but only one as to whether or not the defendant understood the confession when he made it. It is to be noted that immediately after the giving of the instruction referred to, the court added, in the second italicized paragraph, that if a confession is freely and voluntarily made, it is evidence of great importance. This, together with the first italicized paragraph, is all that the trial judge said to the jury upon the question of the voluntariness of the confession. The rest of the instructions concerning the confession told the jury that if they found that the defendant, despite his intoxication, understood the confession they were to consider it, but that if they found the contrary they must not consider it. In the course of his discussion of this topic, the judge told the jury, in terms of the third italicized portion of the quoted instructions, that if they found that the defendant understood the questions and what he was doing, "then the confession is admissible in evidence and . . . one of the pieces of evidence for you to consider." Again, in the fourth italicized portion, the judge said that if the defendant was in such mental condition that he understood the questions and answers, "then the confession is admissible in evidence and you may consider it." And finally, in the fifth italicized portion, the court said "if you find that it [the confession] is something he understood, then you are to consider it; . . ." Thus, while the jury were but once and but impliedly told that if they found the confession involuntary they were not to consider it, they were thereafter three times expressly told that if they found the confession was understood by the defendant, they were to consider it; and the jury were once expressly told that the first question to decide on the subject of the confession was whether or not the defendant was in such mental condition as to be able to understand the questions and answers, and that if he was, then the confession was admissible and the jury might consider it.
*27 Associate Justice Miller and I are unable to escape the conclusion that the jury must have believed from the instructions that all that they had to determine so far as the confession was concerned, was whether or not the defendant understood it when he made it. Putting it otherwise, we think that the instructions so over-emphasized the question whether or not the confession was understood by the defendant that the other question, whether or not it was voluntary, must have been lost sight of by the jury. We conclude, therefore, that the jury must be said not to have passed upon the question of the voluntariness of the confession. Thus the defendant was deprived of the judgment of the jury upon that question, with the possible result that they might have disregarded the confession.
The Government, seeking to support the instructions as given, points out that the first italicized paragraph quoted is in terms Prayer No. 16 for the defendant, and asserts that no further instruction on the subject of the voluntariness of the confession was asked, and no exception taken to the charge given. It is true that no other instructions were requested before or at the time Prayer No. 16 was given. But before the judge had given the instructions throughout, the defendant's counsel could not foresee what they and their effect as a whole would be. And after the instructions had all been given, the defendant's counsel did call to the attention of the trial judge the fact that in their view he had left the jury under the impression that the confession was admissible if the defendant understood it, without respect to the question of the effect of the circumstances under which the confession was made to make it involuntary. The record shows that:
". . . the suggestion was made to the Court that the Court's instruction on the admission of the confession might have left the jury under the impression that the confession was admissible if the defendant when he made it was sufficiently sober to know what he was doing, in which case the jury would be excluding from consideration in that connection the alleged mental cruelty exerted upon the defendant. . . ."
But the trial judge was apparently of the view that he had sufficiently instructed the jury on both topics, because he declined to modify or complete the instructions in the respect complained of. It is true that the defendant's counsel did not at this time note an exception. But they did bring the asserted error to the attention of the judge so that he had an opportunity to correct it if he thought it to be error. In Thomas v. District of Columbia, 1937, 67 App.D.C. 179, 183, 90 F.2d 424, 428, we said, quoting from United States v. Atkinson, 1936, 297 U.S. 157, 160, 56 S.Ct. 391, 80 L.Ed. 555:
"In exceptional circumstances, especially in criminal cases, appellate courts, in the public interest, may, of their own motion, notice errors to which no exception has been taken, if the errors are obvious, or if they otherwise seriously affect the fairness, integrity or public reputation of judicial proceedings."
See Kinard v. United States, 1938, 69 App. D.C. 322, 101 F.2d 246.
Associate Justice Edgerton, although of the view above stated that the confession ought not to have been admitted in evidence at all, believes that, since it was admitted, the defect in the instructions constitutes a further reversible error.
Chief Justice Groner and Associate Justice Vinson agree that the instructions on the subject of the confession were defective for the reasons above set forth, but they believe that under the evidence concerning the confession, no reasonable juryman could have reached any conclusion except that the confession was voluntary. They therefore think that the error in the instructions was harmless.

III
At the close of all the evidence, the defendant's counsel moved the court to take the case from the jury so far as the charge of murder in the first degree was concerned, but the court refused. This it is urged was error. It is asserted that the evidence was not sufficient to prove beyond a reasonable doubt the existence of the elements of deliberation and premeditation requisite to the crime of murder in the first degree. It is the view of the entire court that if the confession of the defendant be considered, including not only the statements reduced to writing but also those made orally to the officers, there was ample evidence of deliberation and premeditation. The defendant had said that he was jealous of the "fat man"; that he had quarreled with the deceased over her association with him, and had threatened to kill her if she *28 did not give him up. The deceased went down from her apartment with an ice pick, apparently to attack the defendant; he took the furnace shaker and followed her back upstairs; and then, when she was lying on the bed, he killed her with the shaker.
Associate Justice Miller and I (who think that, if the jury had been properly instructed upon the subject of the confession, they might have disregarded it) and Associate Justice Edgerton (who thinks that the confession should have been excluded) are of the view that in the absence of the confession, the evidence is insufficient to convict the defendant of murder in the first degree. We think that, with the confession out of the case, there is nothing left tending to prove deliberation and premeditation except the apparent character of the blows and the weapon and the fact that the furnace shaker had been cleaned. So far as the character of the blows and the weapon are concerned, they are as consistent with a killing without deliberation and premeditation as they are with a killing with those elements present. So far as the washing of the furnace shaker is concerned, that is as consistent with a desire to conceal a lesser crime as it is with a desire to conceal the crime of first degree murder.
While Chief Justice Groner and Associate Justice Vinson think, as above stated, that the error in the instructions concerning the question whether the confession was voluntary was harmless, they agree that it was the duty of the trial judge to instruct the jury, as the trial judge did, that, unless they found the defendant understood the confession, they must disregard it. That is, while they are of the view that no reasonable juryman under the evidence could have found the confession not voluntary, they agree that there was evidence from which the jury might have found that it was not understood. They, therefore, agree with Associate Justices Miller, Edgerton and me that since the case is to be retried it should be here stated, for the guidance of the trial judge, that if the evidence on the retrial is identical with that herein, and the confession is again submitted to the jury, under such instructions as are herein ruled to be necessary, then the trial judge should complete the instructions by telling the jury that if they conclude under the evidence and instructions to disregard the confession they cannot convict the defendant of murder in the first degree, for the reason that the evidence is insufficient in the absence of the confession to sustain such a verdict.

IV
In the course of the instructions on the subject of the elements of murder in the first and second degrees, the court said to the jury:
"To constitute murder in the first degree there must be deliberate and premeditated malice, that is, there must be a plan formed to kill, and there must be some deliberation and some overt action. There must be an actual plan to kill which has been meditated and thought over before the plan is actually carried out.
"No particular length of time is required. It is enough if there has been sufficient time to deliberate over it and an intent to kill has been formed and deliberated upon.
"It has been argued during the discussion which you have just heard that you should find from this evidence that the defendant, having formed a plan to kill, went from either the first floor of the house or from the front part of the basement into the furnace room, obtained the shaker, and with the shaker inflicted the blows. Now, that would be sufficient time to deliberate and meditate over the plan, if you find that the plan was formed that far in advance of the crime of the striking.
"So, then, to constitute murder in the first degree there must be actual intent to kill, meditated and deliberated over. If it has not been meditated and deliberated over, the offense cannot be murder in the first degree. If there has been a killing and it has been done with malice in the sense I have mentioned, the offense would be murder in the second degree.
"If there was an intent to kill, but it was formed without time for deliberation or meditation, that is, if it was formed at the instant of striking the blow and not deliberating and premeditating it over, still it would not be murder in the first degree but murder in the second degree." [Italics supplied]
It is contended on the appeal that the italicized portion of the quoted instructions was erroneous. The apparent basis of the contention is that in the sentence in question the jury was in effect required to find that the time referred to was sufficient for *29 deliberation and premeditation over a plan to kill, whereas, under the law, that question and the question of whether or not there was actually deliberation and premeditation must be left to the judgment of the jury. But at the outset of the instructions, the court had told the jury:
"It is your duty and exclusive function to consider the evidence, to determine the facts which you think are proven by the evidence, to apply to those facts the principles of law which I am about to state to you, and then determine what your verdict shall be."
And again the court said:
"I have a right to comment on the facts and I may do that in illustrating the law, but please understand I do not want to interfere in any way with your function. It is your exclusive function to pass on the facts in this case. You should take the law as I give it to you, but you and you only judge the facts."
The full court is of the view that the contention of the defendant in this aspect of the case is without merit. Upon the whole of the instructions, it is clear that the jury must have known that it was their function to pass upon each element in the case and must have been able to understand, therefore, that the portion of the instructions complained of was illustrative and not binding.

V
The defendant contends that upon the whole of the instructions the jury must have concluded that they were obliged to find the defendant guilty of homicide in some degree, that is, either murder in the first degree, murder in the second degree, or manslaughter, and that they were not given to understand that "not guilty" was also a possible verdict. The defendant points out that at the outset of the instructions, the court told the jury:
"Now, that indictment in the language which I have given to you charges murder in the first degree. But, as you know, every such indictment includes the charge of all degrees of unlawful homicide, from the highest to the lowest. So that you have now two questions to determine: First, Did this defendant inflict the fatal blows upon Mrs. Anderson? If he did, then what is the degree of his guilt?"
The defendant asserts that nowhere in the instructions were the jury told in terms that they might find him not guilty unless convinced beyond a reasonable doubt of the existence of every element of some offense.
Consideration of the whole of the instructions discloses that while the jury were told in the usual terms that the defendant was presumed to be innocent, and that the presumption of innocence continued with him throughout the case until overcome by proof beyond a reasonable doubt, and that the burden of proof was upon the Government, nevertheless the instructions were largely devoted to the discussion of the elements of the three crimes of murder in the first degree, murder in the second degree, and manslaughter, and to the possible effect of intoxication upon the existence of specific intent and deliberation and premeditation. And it is true that nowhere in the instructions were the jury in terms told that unless they found beyond a reasonable doubt that all of the elements of some crime existed, they must acquit the defendant. The jury were told in one place:
"Of course, if you do not find that the defendant struck the fatal blows, that is the end of the case and you needn't spend any more time on it. If you find he did strike the fatal blows, then I instruct you as a matter of law he is guilty of criminal homicide, and the only question for you to determine is which degree it was, whether first or second degree, or manslaughter." [Italics supplied]
Notwithstanding this, it is the view of Associate Justices Miller and Vinson and myself that the contention of the defendant in this aspect of the case is meritorious. We think it should be orthodox practice somewhere in the instructions to tell the jury once in precise terms that a not guilty verdict is necessary in the event of failure by the Government to prove each of the elements of some offense beyond a reasonable doubt. While this was implied in the language last above quoted, it was not, in our view, stated with sufficient explicitness. Chief Justice Groner and Associate Justice Edgerton dissent from this view.

VI
Examination of the record in this case indicates that the defendant's prayers for instructions Nos. 1, 3, 6, 7, 9, 12 and 13, though marked "Granted" were not given to the jury by the court in the course of its charge or otherwise. For some reason not clear, no assignments of error were made in respect of these omissions, and no comment was made upon them either in *30 the briefs or in the oral argument for the defendant. It is settled that if plain error is committed in a matter vital to the defendant in a criminal case, the appellate court is at liberty to notice and correct it, even though it has not been brought to the attention of the trial judge or the appellate court in the usual manner. Wiborg v. United States, 1896, 163 U.S. 632, 16 S. Ct. 1127, 41 L.Ed. 289. See also United States v. Atkinson, 1936, 297 U.S. 157, 160, 56 S.Ct. 391, 80 L.Ed. 555, and cases there cited; Thomas v. District of Columbia, supra.
In several instances the requested instructions were not only not given to the jury in terms, but also were not covered substantially by the general charge. Defendant's Prayer No. 1 was as follows:
"You are instructed as a matter of law that the defendant is presumed to be innocent. He is not required to prove himself innocent or to produce evidence at all on that subject. In considering the testimony you must consider and view it in the light of this presumption with which the law clothes the defendant. It is a presumption that abides with him throughout the trial of the case until the evidence convinces each individual juror of his guilt beyond all reasonable doubt. Consented to. Granted." [Italics supplied]
The court did instruct the jury in the usual manner concerning the presumption of innocence and the continuity of the same throughout the case until overcome by the evidence beyond a reasonable doubt, and the court told the jury that the indictment was not evidence and that the burden of proof was upon the Government. But nowhere were the jury told that the defendant is not required to prove himself innocent or to produce evidence at all on the subject of his innocence. As a matter of strict logic, the jury might conclude from the fact that the defendant is presumed to be innocent and that the burden of proof is upon the Government that he himself is not required to prove innocence or to produce evidence. But the mere fact that as a matter of logic the jury might reach such a conclusion is no assurance that it will. The jury is an untrained body and it is the duty of the court to make as clear as is possible just what the law is.
The defendant's Prayer No. 3 was as follows:
"You are instructed as a matter of law that the burden of proof is always upon the prosecution. It is not sufficient to establish a probability though a strong one, arising from the doctrine of chance, that the fact charged is more likely to be true than the contrary, but the evidence must establish the truth of the fact beyond a reasonable doubt. Granted. No objection." [Italics supplied]
The italicized portion of this requested instruction was not given either in terms or in substance in the charge to the jury. Its content might have been inferred from the statement of the duty of proof beyond a reasonable doubt and the definition of reasonable doubt in the general charge. But again it is not certain that the jury would be able, in the absence of clear explanation by the court, itself to understand that probabilities arising from the doctrine of chance are not sufficient to establish the essential facts in the case.
The defendant's Prayer No. 6 was as follows:
"The District of Columbia law describes the crime of murder in the first degree as follows: `Whoever, being of sound memory and discretion, purposely and of deliberate and premeditated malice * * * kills another, is guilty of murder in the first degree.' The burden of proving each essential element of the offense is placed upon the prosecution, and until each essential element is established to your satisfaction beyond any reasonable doubt, you can not return a verdict of guilty as indicted. You are instructed as a matter of law that before you would be justified in returning a verdict of guilty of murder in the first degree you must find that the defendant had formed prior to the killing, with deliberation and premeditation, a purpose to kill the deceased. By premeditation is meant the thinking over, deliberating upon, weighing in the mind beforehand, the deliberate intention to kill. Granted. No objection." [Italics supplied]
The italicized portion of this requested instruction was not given either in terms or in substance in the charge. The purpose of such an instruction is to impress upon the mind of the triers of fact the proposition that guilt depends upon demonstration beyond a reasonable doubt of the existence of each of the several elements which, as a matter of law, constitute the crime charged, rather than upon some vague *31 general notion that the defendant did some sort of wrongful act. Such an instruction is to be contrasted with those which tell a jury that they may not convict if they have a reasonable doubt "upon the whole evidence" or that they may convict if "upon the whole evidence" they are convinced beyond a reasonable doubt of guilt. The charge actually given to the jury in the instant case belongs to the latter type of instructions. In Spear v. United States, 8 Cir., 1916, 228 F. 485, 488, conviction for using the mails to defraud was reversed for the sole reason that the court had charged the jury as follows:
"Another thing about the reasonable doubt: I want to say to you it is not necessary that you must be satisfied beyond a reasonable doubt of the truth of every material allegation in the indictment. It means this: That taking all the evidence together, upon the whole question, are you satisfied beyond a reasonable doubt that he is guilty? If you are, then your verdict should be guilty. If you are not, then your verdict should be not guilty."
In reversing the case, the court said:
"We think the instruction is misleading. It tends to induce a jury, impressed by the evil character of some part of the transaction, to overlook a lack of proof of a vital factor of the offense, and to find guilt in a general sense. The material allegations in an indictment must comprise all the substantive elements of the offense charged, and manifestly the measure of proof required for each should not be less than upon the ultimate issue of guilt. . . ."
See also Heard v. United States, 8 Cir., 1915, 228 F. 503, 504, where a conviction for stealing packages of money being transported in interstate shipment was reversed because of an instruction in the following terms:
"Now, gentlemen, it is not necessary for the government to prove every one of the material allegations beyond a reasonable doubt. It must prove them by evidence satisfactory to you that they are proven; but upon the whole evidence, before you can find them guilty, you must be satisfied of their guilt beyond a reasonable doubt."
The reversal was upon the authority of Spear v. United States, supra. See also upon this subject State v. Ottley, 1910, 147 Iowa 329, 333, 126 N.W. 334, 335.
The defendant's Prayer No. 9 was as follows:
"If you believe beyond a reasonable doubt that the defendant is guilty of some grade of culpable homicide but you have a reasonable doubt as to whether he is guilty of first or second degree murder you are instructed as a matter of law that you can not find him guilty of a higher offense than second degree murder. Granted."
While this instruction is incomplete in that it uses the phrase "culpable homicide," which includes manslaughter as well as first and second degree murder, and yet fails to tell the jury that if they have a reasonable doubt as to whether the defendant is guilty of second degree murder or manslaughter, they must find guilt of the latter, this omission is that of the defendant in making the request and it does not make the instruction so meaningless as to have required the court to reject it. And where a crime is divided into degrees, it is, according to what we regard as the better view in the courts, thought not sufficient merely to define the elements which comprise each degree of the crime charged and then to tell the jury that the defendant must be found guilty beyond a reasonable doubt. It is thought that the jury, unless the reasonable doubt requirement is made specifically applicable to doubt as to the degree of the crime, may in confusion find the defendant guilty of a degree as to the existence of which they did have a reasonable doubt. Such a result may be guarded against by an instruction in some such form of words as is used in Prayer No. 9. Such a form of instruction is required in several states. See Coolman v. State, 1904, 163 Ind. 503, 72 N.E. 568; State v. Neis, 1886, 68 Iowa 469, 27 N.W. 460;[2] Shelton v. Commonwealth, 1911, 145 Ky. 543, 546, 140 S.W. 670, 671; Richardson v. State, 1922, 91 Tex.Cr. 318, 326, 239 S.W. 218, 222, 20 A.L.R. 1249; Hanners v. State, 1926, 104 Tex.Cr. 442, 446, 284 S.W. 554, 556; Sparks v. State, 1927, 108 Tex.Cr. 367, 370, 300 S.W. 938, 939. To the contrary see: Ramsey v. State, 1893, 92 Ga. 53, 65, 17 S.E. 613, 616; State v. May, *32 1903, 172 Mo. 630, 651, 72 S.W. 918, 924; Miller v. State, 1909, 139 Wis. 57, 81, 119 N.W. 850, 860.
The defendant's Prayer No. 12 was as follows:
"The Court instructs the jury that every material fact, whether direct or circumstantial, essential to the establishment of the guilt of the accused, must be proven to the satisfaction of the jury beyond all reasonable doubt. Granted. No obj."
We do not assume to say that in all cases an instruction in such terms and such an instruction as is embodied in Prayer No. 6 must both be given. The latter has to do with proof beyond a reasonable doubt of the elements of the crime, and the former with establishment beyond a reasonable doubt of the facts from which the elements are themselves inferred. It may be that in some situations the giving of such an instruction as Prayer No. 12 would alone be sufficient. But in particular cases the remarks of the court or counsel, interjections of jurors, or episodes in the course of the trial necessitate precautionary emphasis. Since the trial judge marked both Prayer No. 6 and Prayer No. 12 as granted, we must assume that he had some good reason to regard it as appropriate to give both.
The defendant's Prayer No. 13 was as follows:
"The Court instructs the jury that the accused, being charged with crime is entitled to have the benefit of all the principles of law, and the rules of practice as laid down by the Court, designed to safeguard life and liberty, . . . Granted."
This instruction was given neither in terms nor in substance. It was a precautionary instruction appropriate for this case.
It is error not to give requested instructions if they correctly state the law and are warranted by the issues and the evidence, unless the substance of the requests is correctly, substantially and fairly covered by the general charge of the court or by other instructions of either party given by the court. Jones v. United States, 1923, 53 App.D.C. 138, 289 F. 536; People v. Williamson, 1907, 6 Cal.App. 336, 92 P. 313; Commonwealth v. Maddocks, 1910, 207 Mass. 152, 93 N.E. 253; State v. McGrath, 1912, 119 Minn. 321, 138 N. W. 310; State v. De Geralmo, 1912, 83 N. J.L. 135, 83 A. 643; Territory v. Pino, 1899, 9 N.M. 598, 58 P. 393. See Kinard v. United States, 1938, 68 App.D.C. 250, 251, 96 F.2d 522, 523. We think that the foregoing requested instructions do correctly state the law and were warranted by the issues and the evidence and should have been given.
The defendant's Prayer No. 7 was as follows:
"You are instructed as a matter of law that the District of Columbia Code describes murder in the second degree as follows: `Whoever with malice aforethought kills another is guilty of murder in the second degree.' Malice aforethought comprehends a heart regardless of social duty and a mind bent on mischief. It is an act of a generally depraved, wicked, and malicious spirit. It is an act done with a depraved mind and attended with circumstances which indicate a wilful disregard of the rights or the safety of others. If you find after your deliberation that the killing, no matter how malicious, was not the result of premeditation as has been defined, or if the evidence therein is evenly balanced, your verdict can be no higher than murder in the second degree. Granted as amended. No objection." [Italics supplied]
The italicized definition of malice was not given either in terms or in substance. The instructions actually given upon malice were the following:
"The legal meaning of the word `malice' is the condition of mind which causes a man to do an act injurious to another. Now, it may mean illwill or hatred. That is the meaning we give to the word `malice' in ordinary use, and, of course, if you find it was that in this case, that would be sufficient.
"But the legal definition goes much farther than hatred or illwill. It is not limited to those. But any unlawful act done without legal justification or excuse is said to be done with malice.
"For instance, during the argument it was argued that if this defendant inflicted these blows, that would be such an unlawful act as to be malicious in the eyes of the law, unless it was done under circumstances of great provocation, which caused the defendant to fly into great passion and to strike the blows under the influence of the provocation and hot blood or passion, in which event it would be only manslaughter.
*33 "To find murder of any kind there must be the malice, and, as I have said, it would constitute a malicious act if the blow was struck unlawfully with this iron bar or shaker."
The definition of malice given in the requested instruction has the sanction of this court. See Liggins v. United States, 1924, 54 App.D.C. 302, 306, 297 F. 881, 885. It is preferable for the trial court, especially in criminal cases, to apply the definitions having the sanction of the decisions in its own jurisdiction; but we think it cannot be said that the defendant was materially prejudiced by the omission in this instance to give the instruction requested. The instructions actually given we think fairly advised the jury on the subject of malice.
In respect of the rulings in topic VI of the opinion all members of the court concur, except Chief Justice Groner, who is of the view that the charge given by the court substantially covered the requested instructions marked "Granted."
Every criminal case should be tried with care, but especially in a case involving a homicide of so heinous a nature as that involved herein it is  because of the danger that the character of the killing will inflame the jury into hasty action  essential that the trial be conducted according to all of the substantive and adjective rules without the due application of which guilt in the legal sense of the term cannot be established under our Constitution. Associate Justices Miller, Edgerton, Vinson and I think that the trial in the instant case was not thus conducted and that the case must therefore be retried. Chief Justice Groner thinks the judgment should be affirmed. In accordance with the foregoing the judgment of the trial court is
Reversed and the case remanded for further proceedings consistent with this opinion.
EDGERTON, Associate Justice.
I infer from Ziang Sung Wan v. United States, 266 U.S. 1, 45 S.Ct. 1, 69 L.Ed. 131, that the defendant's confession should have been excluded. It is true that Wan was sicker than McAffee, but McAffee was 70 years old, and obviously suffering toxic effects of alcohol. He had drunk a quart of liquor, more or less, during the day, and a good deal on the two previous days. It is not disputed that during most of the night he was drunk. At 6 p. m. he was so thoroughly unconscious that a witness had to shake him very hard to wake him. He was taken to the station house and put in a cell, and lost consciousness so promptly that there was difficulty in waking him again at 7 p. m. At some time in the middle of the night the assistant coroner, a physician, gave him an ounce and a half or two ounces of whiskey. It seems clear that the whiskey was by way of treatment for the defendant's "highstrung condition" to which the doctor testified. When defendant signed the confession at about 7 the next morning he was in "a very nervous state;" "a nervous and highstrung condition;" "a little shaky;" he looked "like a man who had just come out of a hangover." He was cold and wet, and told the doctor that he was not feeling well. Again at about 10 a. m., several hours after the confession, defendant was given whiskey to drink upon the advice of the doctor. Clearly he was not a well man at any time during the night.
It is true that the police increased the discomfort of McAffee far less than that of Wan: but they increased it a good deal. McAffee obviously wanted sleep, and he was not permitted to get it except during short intervals. At about 6:30 p. m. officers took him to the police station. They waked him at 7 and took him to the Captain's office for questioning. About 8:30 they questioned him for an hour or more. They questioned him about half an hour at 10 o'clock. Then they took him to the house where the crime was committed, and where the body still was, and questioned him there for half an hour. They questioned him about midnight. By 12:30 he had fallen asleep; they aroused him and brought him out of his cell for questioning. They questioned him in the Captain's office at some time between 1 and 2, and kept him there until 2 or 3. At 3 o'clock he was "talking in a rambling manner." From 3 until about 5 a. m. he seems to have been allowed to sleep. At about 5 he was questioned at the station, taken again to the scene of the crime for "quite some time," and then taken to headquarters, where he signed the confession a few minutes before 8 o'clock. The estimate of a police sergeant, not continuously present, that defendant had "possibly 5 hours of sleep" cannot be correct. Being repeatedly waked up, kept awake, moved about, and questioned, when he must have been in great need of sleep, necessarily inflicted *34 great misery on the defendant and made further inroads on what power of resistance he had in his besotted condition. He got wet and cold from being taken about in the rain. Moreover, his shoes and trousers were taken from him about 8:30 p. m.; he was taken through the streets at least once in pajamas, and was in "underdrawers or pajamas, or something" a large part of the night. This, whatever its purpose, probably tended to weaken his resistance. In Bram v. United States, 168 U.S. 532, 561, 563, 18 S.Ct. 183, 42 L.Ed. 568, in which a confession was held inadmissible, the Supreme Court emphasized among other things the fact that the prisoner had been stripped of his clothing.
Blows, promises, or threats are not necessary to vitiate a confession. Ziang Sung Wan v. United States, 266 U.S. 1, 45 S. Ct. 1, 69 L.Ed. 131; Perrygo v. United States, 55 App.D.C. 80, 83, 2 F.2d 181. The confession in the Wan case was held not "voluntary" because the prisoner, who was ill and in pain, was kept awake, moved about, confronted with evidence, and questioned for many days. In the present case there was far less abuse, but I think there was enough to vitiate the confession. I do not suggest that no questions may be asked of a sick or drunken prisoner, or that he may complain of trifling interferences with his sleep. The misery inflicted upon McAffee was serious. It may have worn down his resistance until the need for peace drove him to say, regardless of the truth, what seemed necessary in order to get it.
From the point of view of one who is not sleepy and can go to bed when he likes, a prisoner makes a bad bargain if he risks his neck for a little rest; but it is human to discount the future when one is suffering from an immediate physical need. We are told that Esau, being hungry, sold his birthright for a mess of pottage. The craving for sleep which follows an overdose of alcohol is urgent. And powers of resistance vary. "In weighing confessions as to whether or not voluntary, the age, character, and situation of the accused at the time it was made, are important considerations." Curry v. State, 203 Ala. 239, 82 So. 489, 493. Much depends "upon the age, the experience, the intelligence, and character of the prisoner." Biscoe v. State of Maryland, 67 Md. 6, 7, 8 A. 571. Mental and physical condition at the time of the confession affect the question. People v. Ferdinand, 194 Cal. 555, 569, 229 P. 341.
I take the principle of the Wan case to be that, if serious and protracted discomfort is inflicted in the effort to get information about a crime, a confession which follows should be excluded as involuntary, at least when the prisoner's character is not shown to be peculiarly rugged and his condition is such as to make him specially susceptible to pressure. I think this case is within that principle. In State v. Powell, 258 Mo. 239, 167 S.W. 559, 561, a colored workman's confession of murder, made to a group of white officers, was held involuntary on two distinct grounds: (1) promises, and (2) questioning which continued, with slight intermissions, from 2 p. m. to 11 or 1 at night. There was far less interference with sleep there than here. The court said: "The age, sex, disposition, and past experience of the party must necessarily be considered. . . . Such a man would hardly be expected to possess strong enough will power to resist indefinitely the accusations and interrogations of expert detectives. . . . The fact that defendant was kept up to a very late hour of the night and vigorously interrogated, and that he appeared to be `tired and worn-out from the strain' are circumstances tending to cast discredit on the confession." In Enoch v. Commonwealth, 141 Va. 411, 126 S.E. 222, a confession was declared inadmissible because it was produced by hours of insistent questioning, partly in the presence of gruesome evidence, in the course of which the prisoner became exhausted. He was questioned, with slight intermissions, from 11 o'clock Saturday morning to 1 o'clock that night. He was questioned on Sunday morning, after 8:30, and almost continuously from 3 or 4 that afternoon until 6 or 7, when he confessed; but from 1 a. m. to 8:30 a. m. on Sunday he was allowed to rest without interruption. McAffee was given no such chance to recuperate.
There are cases in some states which sustain much greater severity than was used here, but I think they should not be followed.
The government's brief points out that defendant was not "accused to his face" until 5 in the morning; but it is not denied that he was suspected earlier, and the taking of his clothing in the evening, to examine it for bloodstains, shows that he was. *35 Moreover, it is not clear that the officers' motive for the treatment which they inflict is important. If a prisoner were brutally beaten, and then confessed, the confession would not be made admissible by proof that the officers told him, and told him truthfully, that they would be satisfied if he incriminated a third person. The questioning which was held to invalidate the confession in State v. Powell, supra, was devoted largely to efforts to implicate others. The probable ineffectiveness of protest from a colored janitor to police officers, and McAffee's besotted condition, are sufficient explanations of his failure to complain at the time; and his condition explains also his purported failure to remember the proceedings later.
It is true, as in many confession cases, that there is objective evidence here which suggests guilt, but it is less impressive than that in the Israel case.[1] There, the evidence included a loaded revolver, with one empty chamber, found on the defendant when he was arrested; a discharged cartridge found at his former boarding place; and the opinion of a firearms expert that the fatal bullet came from the defendant's revolver. Witnesses reported that they had seen him running from the scene of the murder. The police used no physical violence, but several officers questioned him for hours at a time, at intervals, from noon on Wednesday to 4 p. m. on Thursday; and he made a signed confession. The evidence then seemed overwhelming. But physicians examined Israel on the day after his confession and reported that he was a man of weak will, peculiarly subject to suggestion, exhausted, and incapable of making a dependable statement on either day. After a few days' rest he denied the crime, and said that he had confessed because he was so tired that he was willing to admit anything in order to get a rest, and because everything was against him. The physicians "were of the opinion also that if they cared to subject the accused to a continuous and fatiguing line of interrogation, accusation and suggestion in due course he would be reduced to such a mental state that he would admit practically anything that his interrogators desired. They further stated that this was a common phenomenon with certain types of people, and that where such people are subjected to interrogatories, accusations or suggestions from persons of stronger will, the lesser mind will ultimately succumb and accept the conclusions of the more powerful intellect." 15 J.Crim.L. & Crim. 416. The state's attorney for Fairfield County, Connecticut  who was Homer Cummings, later Attorney General of the United States  studied the case, despite the confession. He found that all Israel's incriminating admissions referred to facts previously known to the police, and "presumably related to the accused during the period of his examination." (p. 417) In the present case it is not shown that the freshly-washed furnace-shaker was known to the police, but it was certainly available to them, before the confession. In the Israel case the fire-arms evidence broke down; the eye-witness identifications broke down; an alibi was verified; and the state's attorney entered a nolle prosequi.
Other examples of murder confessions which proved false are given in the Report on Lawlessness in Law Enforcement of the National Commission on Law Observance and Enforcement (Wickersham Commission), p. 182 ff. Cf. Borchard, Convicting the Innocent, pp. 20, 110 ff; Wigmore, Evidence, § 867, note 1. Those who studied the third degree for the Commission[2] found that it not only involves danger of false confession, but actually impairs the efficiency of the police by making them lazy *36 and unenterprising; impairs the administration of criminal law in the courts by making jurors suspicious of police testimony, diverting attention from the main issue, and requiring reversals of some convictions which could have been properly obtained; brutalizes the police, hardens the prisoner, and lowers public esteem for the administration of justice. (pp. 181-190) The Commission itself, which included among others Roscoe Pound, George W. Wickersham, and Newton D. Baker, unanimously reached similar conclusions.
As the Virginia court said in the Enoch case: "The police detectives have testified with apparently great candor and fairness. * * * They verily thought they were doing their duty, and the state a service, in their efforts to secure a confession. But in this they were in error." Enoch v. Commonwealth, 141 Va. 411, 126 S.E. 222, 226. The common-law rule excludes extorted confessions because they may be untrue. The Fifth Amendment excludes them because they are extorted.[3]
As "there was here no conflict of testimony" with regard to the circumstances in which the alleged confession was obtained, the question is whether it was "voluntary or involuntary in contemplation of law." That question was for the court. Concerning it there was "nothing to be passed upon by a jury." West v. United States, 20 App.D.C. 347.
NOTES
[1] While the motive of the police in asking questions would not be controlling if, despite the motive, the manner of the questioning was such as resulted in an involuntary confession, nevertheless the motive of the questioning has some materiality in respect of the probable manner, nature and effect thereof.
[2] In these two states, code provisions exist declaring that where there is reasonable doubt of the degree of the offense of which a defendant is proven to be guilty, he shall be convicted only of the lower degree. See Ind.Stat.Ann. (Burns, 1933) § 9-1806; Iowa Code (1935) § 13918.
[1] Unreported.
[2] Three eminent lawyers, Zechariah Chafee, Jr., Walter H. Pollak, and Carl S. Stern, made an extensive study. Their findings and conclusions are published in the Commission's Report on Lawlessness in Law Enforcement (1931). They define the term "third degree" broadly, to mean "the employment of methods which inflict suffering, physical or mental, upon a person in order to obtain information about a crime." (p. 19) The process, as so defined, frequently involves no violence. "Perhaps the most common thirddegree method is protracted questioning." (p. 72) The authors say: "That in fact there is no correlation between the third degree practice and efficient police administration the evidence leaves us in no doubt. Chicago, with the third degree highly developed, is a particular sufferer from professional and violent crime. Boston has virtually no third degree, and a high standard of police efficiency. . . The English statistics are very persuasive: The third degree does not exist, and the percentage of unsolved crimes is small  judged by the standards of our country, remarkably small." (pp. 188, 189)
[3] They are covered by the provision that "No person . . . shall be compelled in any criminal case to be a witness against himself." Bram v. United States, 168 U.S. 532, 542, 18 S.Ct. 183, 42 L.Ed. 568. Cf. National Commission on Law Observance and Enforcement, Report on Lawlessness in Law Enforcement, p. 26. Nearly all the State constitutions have similar provisions. 4 Wigmore, Evidence, § 2252, note 3. Dean Wigmore and a number of courts, however, limit the effect of these constitutional clauses to statements made in court under process as a witness. Evidence, §§ 823, 2266. But cf. § 2251, p. 822.