[Crim. No. 3106. First Dist., Div. One. Apr. 2, 1956.]

THE PEOPLE, Respondent, v. JOHN STEVEN RYAN, JR., Appellant.

Lewis H. Butler and Clayton R. Janssen, Jr., for Appellant.

Lawrence Vold as Amicus Curiae on behalf of Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, and Victor Griffith, Deputy Attorney General, for Respondent.

WOOD (FRED B.), J.—Convicted of first degree robbery, defendant has appealed from the judgment and from the order denying his motion for new trial. He does not question the sufficiency of the evidence to sustain the verdict. He claims

an erroneous instruction was given upon the trial of the issues presented by his "not guilty" plea, and that upon the trial of the issues presented by his plea of "not guilty by reason of insanity" the district attorney committed prejudicial misconduct and the court erred in the admission of certain evidence and in the giving of certain instructions.

Inasmuch as no one questions the sufficiency of the evidence to support the verdicts, the testimony need not be summarized in as great detail as otherwise might be necessary.

The offense was committed on March 22, 1954. Defendant was attending law school and also held a full time position as deputy sheriff serving civil process. His wife also was employed, as a teacher in the public schools. They lived in the same apartment building as did Mrs. McKernan, the victim of the robbery.

That afternoon he was at home studying. Suddenly he left his desk, picked up his service revolver and effected a disguise consisting of a towel wrapped around his head, sunglasses and a handkerchief over his face. He then proceeded downstairs to the McKernan apartment and knocked on the door. It was approximately 3 o'clock and Mrs. McKernan was at home alone. When she opened the door defendant pointed the revolver at her and announced "This is a robbery." He demanded her money and she gave him all that she had, about $14. He then told her she would have to disrobe because he did not want her to follow him. She partially disrobed and he gagged her and taped her hands together. He left the McKernan apartment, returned to his own apartment and with the exception of his shoes changed into a different suit of clothes.

When the police arrived to investigate the robbery, defendant accompanied them to the McKernan apartment. Mrs. McKernan recognized his voice as being strikingly similar to the voice of the man who had robbed her and informed police thereof, adding that the robber had been wearing shoes exactly like the defendant's.

On April 26th, he was arrested and charged with the crime. At that time he was interviewed by the chief of police and by the sheriff in the office of the chief of police. He related to them in considerable detail what he could remember of the circumstances surrounding the crime. The interview was recorded.

Upon the witness stand he remembered but a few of the events which occurred on the afternoon of March 22d. He testified that after completing his work of serving papers that

day he came home, changed his clothes and started to study. He had a severe headache and took some aspirin. The next thing he remembered was a door opening and a woman standing there. He did not remember the location of the door. He remembered something "about a television set, just the idea of a television set, and something about venetian blinds." He remembered saying something about five children, but couldn't remember in what connection—"It was just an isolated statement, and the first lucid memory I have, the first thing I can remember fairly distinctly is I was standing in this room and a woman was across the bed from me on the floor, and she was praying, and I looked up and saw a crucifix on the wall and I looked down at my hand and I saw a gun in my hand, and it just seemed as though I—well, it was like walking out of darkness into the light. It seemed as though I had just wakened, and I was petrified. I didn't know where I was or what had happened, or what had occurred at all. It just terrified me, so I turned and ran out. . . . Well, when I got out, when I got out to the hallway, I had an idea where I was and I don't know why. I guess I happened to turn to the right, I noticed I was on the back stairway, and I was familiar with the stairway, and I realized that it was the stairway to my apartment house, and I got upstairs. I got into my apartment and I realized I was in my apartment. . . . Well my mind was just in a turmoil. I was just petrified. I didn't know where I had been or what had happened, and I was just in a cold sweat and just shaking all over. I didn't know what had happened. I took my clothes off and took a cold shower. . . . I got out of the shower; I dressed in my normal clothes that I worked in [which were different from the clothes which he had been wearing before he took his shower], and I sat down and I lit a cigarette and I sat by the front window in the apartment and tried to figure out what had happened."*

Defendant exhibited a similar lack of memory of the details of the crime when severally interviewed by the psychiatrists who testified at the second trial concerning his sanity, interviews which they indicated formed in part the basis for their opinions.

---

*This testimony was given upon the second trial. It is substantially the same as that given by the defendant upon this subject at the first trial.

(There appear to have been two trials under the plea of "not guilty by reason of insanity," the first of which did not culminate in a verdict. For the sake of convenience, we refer to the last trial as the "second trial.")

In explanation of the much more complete memory of the events which transpired upon the afternoon of March 22d which he exhibited earlier when interviewed by the sheriff and the chief of police, defendant testified that his own recollection had been confused with facts which the chief of police and a detective sergeant had severally told him and accounts of the crime which had appeared in the newspapers. The detective sergeant testified that he did not discuss with the defendant any of the details of the crime.

Upon the first trial the defense was unconsciousness during the time of the commission of the crime; upon the second trial, temporary insanity during that period.

### I. The Instructions Given Upon the Trial of the "Not Guilty" Plea

Defendant claims prejudicial error in the asserted failure of the court to instruct appropriately on the subject of his claimed unconsciousness during the commission of the acts charged. He says, in his closing brief, that in this regard the court should have instructed substantially as follows: "If you find that the defendant was not conscious of taking property from Mrs. McKernan by force or violence or of using a deadly weapon in so doing, you must find him not guilty even though you find that at other times during his stay in the apartment he was partially or fully conscious."

But defendant did not present this issue with any such clarity during the trial. He requested and the court gave CALJIC Numbers 71-C and 71-D except that the court omitted the concluding portion of 71-D which reads: "and if you should find that the defendant committed an act, which, if he was conscious, would have constituted the crime charged against him or have been an element of that crime, and if you should not be convinced beyond a reasonable doubt that he then was conscious, you shall find that he then was *un*conscious."

Later, the jury returned to the courtroom and the foreman asked: "In arriving at a verdict, are we to consider to what degree defendant knew what he was doing?" Thereupon the court, outside the presence of the jury, discussed with counsel what instructions should be given. Defendant's counsel said "I think the instruction that would cover that would be consciousness," and later "Reread the two instructions on consciousness and any instructions you give on intent,"

whereupon there ensued a discussion* during the course of which defendant's counsel had an opportunity to present the issue he now presents but failed to do so. At the conclusion of that discussion, the court *again read to the jury Instruction Number 71-C and the same portion of 71-D previously given*, plus the full text of Number 71-C, Alternate. When the court during the discussion outside the presence of the jury stated, in effect, that *it was excluding the indicated portion of Number 71-D* because it was in the nature of a formula instruction (the court saying, "that is stereotyped —'if you should find'—") was the time and the opportunity for defendant's counsel to direct attention to the phase thereof ("or have been an element of that crime") to which he now attaches pivotal significance. If counsel had done so, we have no reason to doubt that the court would have covered the point by some appropriate addition to the instruc-

*That discussion, as it appears in the reporter's transcript, pages 464-466, was as follows:

"THE COURT: I think I should give them your No. 18, which is unconscious act, and follow up with your No. 17, which is: If the person acts as if he was conscious, the law presumes he was conscious. MR. HARTLEY [counsel for The People]: Just those two? THE COURT: We might go into intent, but does the word 'consciousness' used there mean a realization of what has happened? MR. CALLAGHAN [defendant's counsel]: Awareness? THE COURT: A realization of what has happened. MR. CALLAGHAN: The latter part, you didn't give anyway. THE COURT: No, no. MR. CALLAGHAN: I would think those two instructions would cover it. THE COURT: That is stereotyped—'if you should find'—I don't like those things. I will give that one. I think it is safe to tell them that the word 'consciousness' as used, means awareness of what is happening. MR. CALLAGHAN: And then you would supplement that remark by these instructions? THE COURT: I will give these too— using the word 'consciousness' means knowingly or an awareness. But does that answer the question? Apparently they think he was somewhat conscious but somewhat unconscious. MR. HARTLEY: Don't you think we can ask the juror to ask the question in another form, so we are sure we have the question in mind? We are not sure of the question. It is an ambiguous question. MR. CALLAGHAN: I think it is rather queer. THE COURT: I have never heard a question put like that. I can't imagine 12 intelligent people—— MR. CALLAGHAN: I think his term—the wording is an unfortunate choice of words. MR. HARTLEY: That is the heart of what he says. MR. CALLAGHAN: I think that what they actually mean is the extent of his awareness. THE COURT: Isn't it true that, if he is aware at all, that he is conscious? MR. CALLAGHAN: I think these two instructions—— THE COURT: Let's answer that question. If he is aware at all of what is going on, he is conscious. MR. CALLAGHAN: If he has an awareness. THE COURT: Do you. agree with that? MR. CALLAGHAN: No, I can't agree with that. That is too limited, because we get into the question there as to whether or not—let's take that case —whether or not he was aware of it. Well, I guess I am getting into the sanity phase of it. THE COURT: I think we should also instruct them that this question has nothing to do with insanity. He is presumed to be sane. MR. CALLAGHAN: That is right in the instructions."

tions which it did give on the subject of unconsciousness. It would hardly seem reasonable to hold the trial judge solely responsible for failing to perceive the asserted significance of the words ''or have been an element of that crime,'' virtually buried in the ''If you should find'' clause, when counsel, whose advice and assistance the court has especially invited, failed to direct attention to those words and failed to mention their claimed significance. (See a discussion of this principle in *Jensen v. Southern Pac. Co.*, 129 Cal.App.2d 67, 77-79 [276 P.2d 703], and cases there cited.) Indeed, there is a fair basis for an inference that the asserted significance of the words ''or have been an element of that crime'' did not occur to defendant's counsel until after oral argument upon this appeal.

No mention of any phase of this subject was made in defendant's opening brief upon this appeal. That brief, in the words of counsel, was ''directed solely to errors committed at the second trial on the issue of insanity.''

Later, amicus curiae filed a brief ''directed to [the question as to] how prejudicially erroneous were the supplementary instructions, relating to unconsciousness, that were given at the trial of appellant's plea of 'Not Guilty.' '' The essence of the argument presented in that brief seems to be that defendant's testimony showed that defendant during the commission of the offense, experienced ''intervals of intermittent total unawareness punctuated by fleeting glimmers of hazy partial awareness''; that Mrs. McKernan's testimony showed that essential elements of the crime of robbery occurred during a time which, according to defendant's testimony, he was ''totally unaware''; and that the instructions given the jury on the subject of unconsciousness did not present clearly this theory of the defense of unconsciousness. In presenting this argument, amicus curiae conceded that defendant did not request instructions covering this precise point, saying: ''Neither counsel, so far as appears, suggested as an answer to the jury's problem that the court give, in addition, a statement about 'semi-conscious' and the stereotyped section 71-C Alternate, which in some particulars differs from the regular section 71-C. It appears, however, that the court's idea took shape in the term 'semi-conscious' and in the statement: 'If he is aware at all of what is going on, he is conscious.' To that way of putting it, defendant's counsel refused to agree, but at the moment could not develop his

objections without getting into the sanity phase of the question, which, of course, had been reserved for the second phase of the trial.'' If counsel for defendant ''could not [at the moment] develop his objections,'' it would not seem reasonable, under the circumstances described, to cast the entire burden upon the trial judge and hold him solely responsible for the failure to see and draw the fine distinctions which many months later were perceived and developed by amicus curiae.

Still later, in the reply brief jointly filed by defendant and amicus curiae, we received the benefit of a draft of an instruction (quoted above, at the beginning of the discussion of this point) which counsel say the trial judge should have conceived and delivered *sua sponte*.

At oral argument, we directed attention to the fact that the record before us did not clearly indicate who, if either party, requested the instructions now claimed to have been inadequate or incomplete. Subsequently, the parties filed a stipulation clarifying the record in that regard. Not until after that did the defendant direct our particular attention to the omitted portion of Instruction Number 71-D and claim that it contained the missing feature of the instructions on unconsciousness, seeking for the first time to base the urge for a reversal upon an erroneous rejection of a proper instruction instead of a mere failure of the trial court in the absence of such a request to give such an instruction.

We conclude that upon this point defendant has not furnished a sufficient basis for a reversal.

We should add that it is not altogether clear that if defendant had made an appropriate and timely request the evidence is of such a character as to require a reversal. The evidence of unconsciousness came in through defendant's testimony. As we read it, he in effect said he was unconscious during the commission of all of the elements of the crime, not just one or more, less than all, of those elements. If the jury were to believe him, they would conclude that he was unconscious during the periods of which he had no recollection and find that he was unconscious at the time that he asked Mrs. McKernan for the money, at the time that he pointed the gun at her, and at the time that he received the money. Although he was conscious at a time when he had the gun in his hand, he does not state whether he was conscious of the fact that he was pointing it at her. In any event, that consciousness of the gun in his hand occurred after he had forced her with the gun to give him the money. Therefore, that conscious

act could not be an element of the crime of robbery since the crime was already completed.

We can predicate no reversal upon this phase of the trial.

## II. As to Asserted Errors Upon the Trial of the "Not Guilty by Reason of Insanity" Plea.

### A. *Asserted Misconduct of the Prosecutor.*

One of the defendant's experts, Dr. Kelley, testified that in his opinion defendant "was unable to comprehend the nature and the quality of his acts and was equally unable to comprehend whether or not it was wrong, and the consequences."

Upon cross-examination the district attorney interrogated the witness in the terms of a hypothetical case stated by the cross-examiner.*

■ Defendant contends this was improper because facts expressed in the hypothesis were different from the facts in the instant case in certain respects. That rule does not with strictness apply when testing an expert as to his competency.

■ "A wide latitude is permitted in cross-examination of an expert witness in matters tending to test his credibility so that the jury may determine the weight to be given his testimony . . ." (*People* v. *Tallman,* 27 Cal.2d 209, 214 [163 P.2d 857].) ■ We think that in this case the prosecutor did not exceed permissible bounds. At least the facts of the

---

*The passage under consideration reads as follows:

"Mr. Hartley [the prosecutor]: Q. One question, Doctor. I want to ask you what your opinion is about the following set of facts, talking about a man who, during a particular period of what they call pathologic intoxication went to a back yard and tried to rape a child. When she screamed the parent came out of the house. The assailant jumped the fence and fled. He displayed great ingenuity in escaping and eluding capture, gained his own home and went to bed. He was awakened by the police officer, seemed genuinely confused by the charge, and insisted he had been home all the time.

"In response to positive identification, he would not allow his attorney to introduce any evidence of intoxication. He kept repeating, in a hurt and bewildered tone, that he had not been near the scene of the crime.

"In this case considering the question of responsibility within the framework of the intoxication, using the McNaughton formula, since he tried to flee, and carefully eluded capture, it is apparent that during that period, he was conscious he had done something wrong.

"Now, in that particular case, just to recapitulate, we have a man who committed a crime, claimed not to have been there, cleverly evaded pursuit, and then denied the crime.

"A. [Dr. Kelley]: Claimed a blackout? Mr. Callaghan [defense counsel]: Let him answer. Mr. Hartley: Q. He denied it. A. You say he denied it? Q. He was held to have been responsible for his act, although he had a genuine lack of memory. Mr. Callaghan: If it please the Court, I don't know whether this is a question or not. It is not proper cross-examination."

hypothetical case were sufficiently similar to the case at bar to present a question for the trial court's decision, if when the question was first asked objection had been made on the ground that it was not a proper hypothetical question.

■ Nor do we see misconduct in the reference the cross-examiner here made to the McNaughton rule. The witness had upon direct examination discussed quite fully the requirements of the McNaughton rule in relation to various types of mental illness, including the type of mental illness from which he felt defendant was suffering at the time of the offense.

■ However, the district attorney should not have informed witness in the presence of the jury that the man involved in the hypothetical case had been found guilty. But defendant made no objection upon the ground of alleged misconduct, nor did he ask that the remark be stricken, nor did he request that the jury be instructed to disregard this remark. Indeed, his counsel's statement ''let him answer,'' while somewhat ambiguous, is suggestive of an invitation to the district attorney to continue. It is too late now to make the objection for the first time because there is nothing to indicate that the asserted harmful effect of the statement would not have been removed by an admonition to the jury. The failure to request such admonition in such a case is regarded as a waiver. (See *People* v. *Sykes,* 44 Cal.2d 166, 172 [280 P.2d 769] ; *People* v. *Meichtry,* 37 Cal.2d 385, 390 [231 P.2d 847] ; *People* v. *Sieber,* 201 Cal. 341, 355-356 [257 P. 64].)

■ Defendant assigns as misconduct the fact that the district attorney in his argument to the jury spoke disparagingly of psychiatrists and, during the course of those remarks, went outside the evidence to some extent. Most of it was within bounds and any of it that was questionable could have been cured if defendant's counsel had objected and asked that the jury be admonished to ignore it. This he did not do.

Defendant claims that in the cross-examination of Dr. Wilder, psychiatrist, the district attorney ridiculed psychiatrists. We do not so view it. It happened that some of the psychiatric witnesses had asked that certain psychological tests be made and they were made by a Dr. Hamister who, in his report, indicated he was persuaded that the defendant was sane. Upon cross-examination of Dr. Wilder, the district attorney interrogated at some length concerning the different conclusions' which the two had drawn. We see nothing irregular about it; certainly nothing that a timely objection with a proper admonition to the jury would not have cured.

 Defendant assigns as misconduct a statement by the district attorney in his argument to the jury that defendant had no right to take time off from his county job. Defendant says that the State thereby implied that defendant was cheating the county and the state thus prejudiced defendant's case in the minds of the jurymen as taxpayers.

However, his claim of overwork as a full time deputy sheriff and a full time student, thus working from early in the morning until early the next morning, appears to have been a factor considered by the psychiatrists who diagnosed defendant's mental and physical condition and concluded he was not sane at the time of the offense. The State adduced evidence that defendant quite regularly worked at home studying in the afternoons. Defendant admitted he did this to some extent but that it represented compensating time off for overtime in his work for the county; but his superior, Mr. Cerqui, testified that there was such an arrangement conditioned upon the deputy in question arranging with Cerqui in advance for his compensating time off and he recalled no such advance notice or arrangement upon the part of defendant. We deem the prosecutor's statement fair comment. He had the right in his argument to state his view as to what the evidence showed and the conclusions that might fairly be drawn therefrom. (*People* v. *Hoyt*, 20 Cal.2d 306, 318 [125 P.2d 29].)

 Also, it is within the sound discretion of the trial court to determine whether counsel stays within the permissible range of discussion. (*People* v. *Eggers*, 30 Cal.2d 676, 693 [185 P.2d 1].) Defendant failed to give the court an opportunity to rule on the alleged misconduct. He made no objection and thereby waived the point, if any he might otherwise have had.

Next, it is said the district attorney several times told the jury in his argument that a number of lay witnesses had testified that in their opinion defendant was sane. Defendant incorrectly assigns this as a misstatement of the evidence because at least four lay witnesses testified that he was sane, or not insane, several that defendant appeared to be normal, and one that he appeared to be in full contact with reality.

B. *Asserted Denial of Due Process.*

 Five psychiatrists called by the defendant testified as expert witnesses to the effect that defendant was insane at the time of the commission of the acts charged. Three of them, including Dr. Wilder, took into consideration, in formu-

lating their opinions, certain psychological tests of the defendant which had been made and reported by a psychologist, Dr. Hamister.

Dr. Hamister stated in his report, among other things: "Mr. Ryan's offense, in my opinion, resulted from a temporary break-through of repressed impulses, but did not involve a psychotic loss of reality contact." During cross-examination Dr. Wilder explained that Dr. Hamister meant that he thought that defendant was sane at the time of the offense, and stated why he did not accept Dr. Hamister's opinion as to defendant's sanity. Later, the People introduced the Hamister report into evidence as an exhibit.

Defendant now claims that such cross-examination of Dr. Wilder and the introduction of the Hamister report into evidence constituted an infringement of his constitutional right to confront Dr. Hamister as a witness, even though defendant interposed no objection of any kind at the time, not even a suggestion that the Hamister report be limited in its scope as evidence.

In view of the use made of the Hamister report by three of the experts, including Dr. Wilder, the use made of it in cross-examination was proper. If the defendant wanted the report kept out of evidence he should have interposed an appropriate objection. If he wanted the jury to consider it only in respect to its effect as impeachment of Dr. Wilder and the other experts, he should have asked for a limiting instruction. (See *People* v. *Northey,* 77 Cal. 618, 631 [19 P. 865, 20 P. 129]; *People* v. *Pollock,* 25 Cal.App.2d 440, 443-444 [77 P.2d 885]; and cases collected in 18 Cal.Jur.2d 564-567, Evidence §§ 124 and 125.)

Furthermore, it is worthy of note that Dr. Wilder brought Dr. Hamister's opinion into the case during his own direct examination, adding that as a psychologist Dr. Hamister could not give a valid opinion as to sanity.

C. *Instructions Criticised by the Defendant.*

 The giving of an instruction to the effect that the law entertains a rebuttable presumption that the defendant was sane is assigned as prejudicial error predicated upon the fact that the state produced evidence tending to show that defendant was sane.

Defendant invokes the asserted rule in civil cases that a disputable presumption "is dispelled when evidence is produced by the party or his witnesses covering the subject of

the presumption. . . . When there is a conflict in the evidence introduced by the opposing parties, there is no room for the presumption . . ." (*Cole* v. *Ridings,* 95 Cal.App.2d 136, 139 [212 P.2d 597].) This rule in civil cases may not be that broad. (See *Scott* v. *Burke,* 39 Cal.2d 388, 394-395 [247 P.2d 313].)

However, the instant case is a criminal case. We had occasion in *People* v. *Harmon,* 110 Cal.App.2d 545 [243 P.2d 15], to consider whether this rule applies to the issue of sanity in a criminal case in a situation quite similar to that which obtains in the instant case. We there concluded: "Upon the trial of this issue, defendant had the burden of proving his asserted insanity. The State had the benefit of the disputable legal presumption that he was sane, a presumption that remained in to be weighed by the jury with all evidence adduced pro and con. We cannot say *as a matter of law* that the testimony of the alienists overcame this presumption. The jury had before it not only the presumption of sanity but also the conduct and demeanor of the defendant during both trials. In addition, certain portions of defendant's confession tended to indicate a consciousness of guilt and an awareness of the rightness or wrongness of his conduct." (P. 553.)

In the Harmon case there was no opinion evidence (as there is in the instant case) that the defendant was sane but we do not see in that a basis for drawing a different conclusion.

The trial court in defining insanity for the jury applied the McNaughton test, which defendant concedes has been used by the courts of this state, commencing at least as early as 1874. Yet, he contends we should reject it and require a new trial with directions that the test recently recommended in *Durham* v. *United States,* 214 F.2d 862, 874-875 be used. It is not for us as a mere intermediate court to undertake any such innovation; indeed, it is a proposal which probably should be addressed to the Legislature, not to the judiciary.

Moreover, defendant's medical witnesses explained their opinions, as to his sanity, in terms of the McNaughton rule. For example, Dr. Kelley, speaking of defendant's sanity on the day of the crime, said: "at that time, under the McNaughton structure of the Rule of the State of California, he would be declared legally insane." He also said that defendant had "hysterical dissociation, and a hysterical dissociation

is one of the very few mental illnesses which fit the McNaughton rules completely, in which he doesn't know the nature and quality of his act, and is unable to comprehend sanely and evaluate right from wrong.'' He further testified that of the very few mental illnesses ''that specifically fit the McNaughton formula all the way'' hysterical or fugue states are one. Finally, he observed that ''on that specific date [the afternoon of March 22, 1954], John Ryan was unable to comprehend the nature and quality of his acts, and was equally unable to comprehend whether or not it was wrong, and the consequences.''

This testimony indicates that defendant tried the case upon the theory that the McNaughton rule was the rule to apply.

█ Finally, defendant takes exception to the statement, in the following instruction, that the law presumes that the offense was committed during a lucid interval: ''When a person charged with crime interposes the defense of insanity, and the proof shows that he was afflicted with a form of insanity wherein, at one time, he was insane and irresponsible and, at other times, he had lucid or clear intervals, at which times he was able to distinguish between right and wrong, and to know the nature and quality of his acts, the law if and after finding that he committed the act, presumes that it was committed during one of the Defendant's lucid intervals. That presumption may be rebutted, but is controlling until overcome by a preponderance of evidence, showing that the Defendant was insane at the time when the offense was committed.''

Defendant correctly claims that this instruction does not find support in the evidence. Testimony pertinent to this issue was not that defendant had an intermittent type of insanity but, as stated in defendant's opening brief, that he ''had a temporary, uninterrupted mania during the commission of the crime.'' That is not a ''form of insanity, wherein, at one time, he was insane and irresponsible, and, at other times, he had lucid or clear intervals,'' the predicate for the giving of the instruction.

However, this was not prejudicial error. In substance this instruction stated in another way the general presumption of sanity upon which the jury was instructed, but it is improbable that such repetition changed the result, which we believe was reached by weighing the conflicting evidence on the issue of sanity at the time of the commission of the offense, not by

giving undue weight to the presumption because of the repetition in the instructions. The psychiatrists only examined defendant for a few hours some months after the commission of the offense, the earliest of such interviews having occurred on July 7, 1954. Several of them stated that their opinions were based upon the assumption that defendant was telling the truth at the time of their interviews with him and that he was unable to recall many of the details of the crime. The record shows that defendant recalled more of the details of the crime when he confessed to the police than later when interviewed by the psychiatrists. He also remembered more of those details when he confessed than when he testified at the trial. There was also evidence from which it could be inferred that he remembered the crime and was conscious of his guilt. The jury could have inferred that defendant was not truthful about his memory of the details of the crime. Also, the lay witnesses as to his sanity, including friends and acquaintances who had known him for some time, who had observed him immediately after the commission of the offense, and the victim herself, testified that he at all times appeared normal and sane. We conclude that it is improbable that the instruction under discussion affected the result.

The judgment and the order denying a new trial are affirmed.

Peters, P. J., and Bray, J., concurred.

A petition for a rehearing was denied April 17, 1956, and appellant's petition for a hearing by the Supreme Court was denied May 2, 1956. Carter, J., was of the opinion that the petition should be granted.