Clarence L. WRIGHT, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 13148.

United States Court of Appeals
District of Columbia Circuit.

Argued Feb. 1, 1957.

Decided Oct. 30, 1957.

Mr. Albert J. Ahern, Jr., Washington, D. C., with whom Mr. James J. Laughlin, Washington, D. C., was on the brief, for appellant.

Mr. Milton Eisenberg, Asst. U. S. Atty., with whom Messrs. Oliver Gasch, U. S. Atty., Lewis Carroll and Arthur J. McLaughlin, Asst. U. S. Attys., were on the brief, for appellee. Mr. Leo A. Rover, U. S. Atty., at the time record was filed, also entered an appearance for appellee.

Before EDGERTON, Chief Judge, and PRETTYMAN, WILBUR K. MILLER, BAZELON, FAHY, WASHINGTON, DANAHER, BASTIAN and BURGER, Circuit Judges, sitting *en banc.*

BAZELON, Circuit Judge.

On August 6, 1951, a first degree murder indictment was returned against appellant, charging him with the fatal shooting of his wife on June 20, 1951. The judgment of conviction of second degree murder from which he now appeals was entered on January 20, 1956. The time lapse between Wright's indictment and his conviction is attributable to his mental condition.

At arraignment on August 9, 1951, the judge ordered a mental examination of Wright. Another order two weeks later designated Drs. Perretti and Gilbert of the District of Columbia General (then Gallinger Municipal) Hospital to make the examination. Both doctors made their examinations of Wright in September 1951 and both reported him incompetent to stand trial. On October 2, 1951, the District Court, after a hearing, adjudicated Wright to be incompetent to stand trial and committed him to the custody of the Attorney General. Pursuant to that commitment, Wright was placed in the Springfield Medical Center for Federal Prisoners. In November of 1952, the psychiatric staff of that institution having concluded that his competency to be tried had been restored, he was returned to the District of Columbia Jail and in February 1953 was brought to trial and found guilty of first degree murder. But the trial judge, on the basis of testimony adduced during the trial,[1]

---

1. This presumably refers to the testimony of Drs. Rickman and Williams who had examined Wright shortly before the 1953 trial, by court order, and had found him to be of unsound mind.

ordered a further mental examination by the Mental Health Commission. The Commission examined Wright on June 4, 1953, and reported that he was then and had been during his trial of unsound mind. The judge, after holding a hearing, set aside the conviction and again committed Wright to the custody of the Attorney General. Pursuant to that commitment, after some delay, Wright was sent to St. Elizabeths Hospital where he remained until, on November 15, 1955, he was adjudged competent and was ordered to trial. In connection with the second trial, the court ordered Wright examined by Drs. Perretti, Rickman, Williams, Todd and Cavanaugh, all of whom had examined him before, and by Drs. Miller and Odenwald, who had not seen him before. All the doctors found him mentally competent at the time of that series of examinations, in December 1955.

At the trial, Wright's principal defense was insanity and the issues raised on appeal relate largely to that defense. His court-appointed counsel argues that the Government failed to sustain its burden of proving beyond a reasonable doubt that Wright was sane when he shot his wife. He also argues error in the refusal of certain jury instructions relating to the insanity issue.

*Evidence on the Issue of Sanity*

██ It is not questioned that, when the defendant introduces some evidence to raise the issue of insanity, his sanity at the time of the offense becomes an element of the crime, which, like all other elements of the crime, must be proved by the Government beyond a reasonable doubt. Davis v. United States, 1895, 160 U.S. 469, 488, 16 S.Ct. 353, 40 L.Ed. 499; Tatum v. United States, 1951, 88 U.S.App.D.C. 386, 190 F.2d 612; Douglas v. United States, 1956, 99 U.S.App.D.C. 232, 239 F.2d 52. When the Government has not sustained its burden of proof, i. e., when it appears that reasonable jurymen could not conclude beyond a reasonable doubt that the act was not the product of defendant's mental illness, "there is a duty to set aside a verdict of guilty and to direct a verdict of not guilty by reason of insanity" or to order a new trial. Douglas v. United States, 99 U.S.App.D.C. at page 237, 240, 239 F.2d at page 57, 60; Curley v. United States, 81 U.S.App.D.C. 389, 160 F.2d 229, certiorari denied, 1947, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850.

█ The nature and quantum of evidence of sanity which the Government must produce to sustain its burden and take the issue to the jury will vary in different cases. Evidence of sanity which may suffice in a case where defendant has introduced merely "some evidence" of insanity may be altogether inadequate in a case where the evidence of insanity is substantial. Before considering the sufficiency of the Government's proof in the instant case, therefore, we must assess the evidence of insanity introduced by the appellant.

Wright made his showing of insanity through the testimony of eleven of the Government or court-appointed psychiatrists who examined him or had him under treatment almost continuously during the four years between his arraignment and his trial. This testimony was supplemented by reading to the jury copious extracts from the records of the two mental institutions in which he had spent the major part of those four years.

Drs. Perretti and Gilbert, who had examined Wright in September 1951, testified that they had found him suffering from schizophrenia. In Dr. Perretti's opinion, the condition dated back to the time of the crime (about three months before the examination). Dr. Gilbert, though not stating a specific opinion, said that the disease Wright had "doesn't come or go overnight." Drs. Rickman and Williams, who had examined Wright just before his 1953 trial and found him suffering from psychomotor seizures and schizophrenia, testified that the illness, in their opinion, dated back to the time of the crime. Drs. Todd and Cavanaugh

of the Mental Health Commission, who had examined Wright shortly after his 1953 conviction, testified that they had found him to have schizophrenia and to be mentally deficient. Dr. Cavanaugh could not say whether the condition could be dated back to the date of the shooting; Dr. Todd said that the condition observed in 1953 could be traced back several months, but that 1951 was too far back. Drs. Cushard, Epstein and Tartaglino, the St. Elizabeths staff doctors who examined Wright beginning early in 1954, testified that he was then suffering from schizophrenia. On the basis of the information they had, however, they could not say whether or not the condition had existed in June 1951. Dr. Cushard pointed out that they had never been asked to conduct an examination to determine Wright's June 1951 condition. Drs. Miller and Odenwald who examined Wright in December 1955 testified that he had been suffering from schizophrenia at the time of the shooting. Dr. Miller's opinion was based on a history obtained from Wright and medical history derived from the hospital records. Dr. Odenwald based his opinion on what he could learn of the medical history from Wright himself.

As to causal connection, four of the five witnesses who said that Wright was mentally ill at the time of the shooting were asked whether the act was the product of the illness. Dr. Perretti said, "Yes"; Dr. Miller said, "Could very well be"; Dr. Williams said, "Likely"; and Dr. Odenwald said, "Surely possible." Dr. Rickman, the fifth of the witnesses who testified that Wright had been mentally ill at the time of the shooting, and Dr. Gilbert, who indicated that he probably had been, were not asked whether they thought the act was a product of the illness. Nor was that question put to Drs. Todd, Cavanaugh and Tartaglino. Drs. Epstein and Cushard, when asked the causation question, replied that they had insufficient data to support an opinion, Dr. Cushard noting that the causal connection between an individual's men-

tal illness and his act "requires very intensive investigation and examination of the person."

In summary of Wright's showing of insanity, we observe that (1) five or six of the eleven psychiatrists who testified were of the opinion that he had been mentally ill at the time of the shooting; and (2) several of them stated, with varying degrees of certainty, that the shooting was the product of the illness.

The Government challenges Wright's showing of insanity on several grounds. It points out, first, that some of the doctors who examined Wright were unable to say that he was mentally ill at the time of the shooting. But this does not detract from the testimony of the doctors who were able to state an opinion that he was ill at that time. None of the eleven witnesses said that he was not ill at the time of the shooting or that the shooting was not the product of the illness. Nor did any of the doctors who could not state an opinion challenge either the qualifications or the reasoning of those who did state an opinion. There was thus no conflict in the medical testimony.

■■ Next the Government attacks as uncertain and inconclusive most of the testimony that the act was the product of the illness. Only Dr. Perretti, the first doctor to examine Wright after his arrest, gave an unequivocal opinion that the illness caused the act. Three other doctors expressed their opinions in degrees of probability. Obviously, unequivocal opinions, if obtainable, are more desirable than equivocal ones. But the opinion to which a psychiatrist testifies, need only be "the type of clinical opinion he is accustomed to form and to rely upon in the practice of his profession." It need not consist of "mathematically demonstrable certainties." Blunt v. United States, 1957, 100 U.S. App.D.C. 266, 275, 244 F.2d 355, 364. Moreover, Dr. Cushard, who was unable from 1954 examinations to say either whether Wright had been ill in 1951 or

whether the illness caused the act, said he would need to make a "very intensive investigation and examination" to answer the causation question. That such an investigation and examination was not conducted is not Wright's fault. Many deficiencies in the process by which we collect the evidence upon which cases like this turn, are within the prosecution's capacity to remedy and should not be chargeable to the accused if he has no control over them. Blunt v. United States, 100 U.S.App.D.C. at page 275, 244 F.2d at page 364, note 23.

The same can be said of the Government's third attack on the psychiatric evidence of insanity—that many or all of the psychiatric examinations were too remote in time from the date of the shooting to afford a basis for an expert opinion as to Wright's mental condition on that date.[2] The record shows that the question as to Wright's sanity arose at his arraignment on August 9, 1951, and that the court ordered a mental examination on that date. It is not contended that Wright was responsible for the delay that ensued or for the fact that the examinations held in compliance with the August 1951 and the numerous subsequent court orders may not have been as thorough as psychiatrists would prefer. If the Government feels that psychiatric opinions which come into evidence ought to be based on examinations of greater scope and intensity than has been the practice heretofore, it can and should arrange to have such examinations made.

■ Wright's showing of insanity, far from being merely "some evidence" of insanity, is about as strong as can ever be made, unless the accused happens to have had a psychiatric examination immediately prior to his act. To send the case to the jury in the face of so strong a showing of insanity requires more than minimal evidence of sanity.

The only evidence offered by the Government to sustain its burden of proving beyond a reasonable doubt that Wright was sane when the shooting occurred was the testimony of two policemen. The Government's brief summarizes that testimony as follows:

"Officer Walker, who arrested the defendant within minutes after the shooting, stated that during the time he talked to the defendant he believed the defendant was *rational* and *of sound mind* although he was nervous (R. 135–136). Officer Hartnett, who was with the defendant both on the morning of the crime and the day after the defendant's wife succumbed, was of the same opinion (R. 210–211). The officer stated that he had *no trouble understanding the defendant*, that the defendant gave *responsive answers* to his questions, and that as far as he could ascertain from looking and listening to the defendant, he was *rational* at the time (R. 210–211). The officer also said that the defendant was *coherent* during all the times that they talked, and he gave it as his opinion that the defendant was of *sound mind* during the critical period (R. 210–211)." [Emphasis supplied.]

■ Although the testimony of lay witnesses may be competent evidence on the issue of sanity, it does not follow that, in the face of a substantial showing of insanity, the Government may send the issue to the jury simply by having two policemen testify, "He looked all right

---

2. Moreover, whether, despite time lapse between the offense and the examination, a psychiatric opinion can be formed as to the accused's mental condition on the crucial date is a medical question within the competence of the qualified expert witness. The expert's qualifications being conceded, the court should be reluctant to exclude from evidence any relevant opinion which the expert feels able to give on the basis of observed or hypothetical facts. Of course, the fact basis of the opinion is a circumstance to be considered by the trier of the facts in determining the weight to be given to the opinion.

**10**

to me." The probative value of any opinion on the issue of sanity depends on the facts upon which it is based. This is especially true of a lay opinion. Lay "witnesses may testify only upon the basis of facts known to them. They may testify as to their own observations and may then express an opinion based upon those observations. Of course the testimony of a lay witness with training in this or related fields may have more value than the testimony of a witness with no such training.[3] Also obvious upon a moment's reflection is the fact that, while a lay witness's observation of abnormal acts by an accused may be of great value as evidence, a statement that the witness never observed an abnormal act on the part of the accused is of value if, but only if, the witness had prolonged and intimate contact with the accused." Carter v. United States, 101 U.S.App.D.C. —, 252 F.2d 608.

Reasonable jurymen could not conclude beyond a reasonable doubt, from the testimony of these two policemen or from the rest of the record before us, that Wright was sane at the time of the shooting.

■ In addition to the evidence of sanity it offered itself, the Government relies on the fact that all the psychiatrists who testified at the trial for the defense said that Wright was at that time—in December 1955—of sound mind. As was pointed out in Lyles v. United States, 101 U.S.App.D.C. —, — F.2d —, "evidence as to insanity at any time—the present as well as any other— may be admitted * * * where it is used by a witness as part of the data upon which he bases a conclusion as to mental condition at the time of the offense." Here, none of the psychiatrists gave an opinion that Wright was sane at the time of the crime. For subsequent mental condition to be a premise from which the jury may draw an inference as to mental condition at the time of the crime, there must be such a circumstantial relationship between the two periods as demonstrates the relevance of one to the other. Since four and one-half years elapsed between the time of the offense and the time of the trial and, during that interval, Wright went through long courses of treatment in two mental institutions, his 1955 soundness of mind cannot be said to be sufficiently probative of 1951 sanity to take the case to the jury. If proof of present soundness of mind necessarily takes the case to the jury, then, contrary to Douglas, the court could never direct a verdict of not guilty by reason of insanity, since all defendants, on trial, are at least of sound enough mind to be tried.

■ We hold that the Government failed to sustain its burden of proving sanity. The conviction is reversed and the case remanded to the District Court with instructions to grant a new trial if the Government shall request it;[4] or, absent such request, to enter a judgment of acquittal by reason of insanity notwithstanding the verdict.

Since, under our mandate, Wright may be brought to trial again upon the present charge, we express our views on certain matters which would be pertinent upon retrial.

*The Jury Instructions*

1. The judge instructed the jury that it could return one of five possible verdicts: guilty of murder in the first degree, guilty of murder in the second degree, guilty of manslaughter, not guilty by reason of insanity, and not guilty. In connection with the fourth possible verdict, not guilty by reason of insanity, the charge included a recital, virtually *in haec verba,* of the sample instruction suggested in Durham v. United States,

---

3. One of the lay witnesses here believes that "if a man is not violent, he is rational." The other "would say a person of sound mind is just one who isn't of unsound mind."

4. See Douglas v. United States, 1956, 99 U.S.App.D.C. 232, 240, 239 F.2d 52, 60. See also Bryan v. United States, 1950, 338 U.S. 552, 559, 70 S.Ct. 317, 94 L.Ed. 335.

1954, 94 U.S.App.D.C. 228, 214 F.2d 862, 45 A.L.R.2d 1430, and a statement of the Davis rule that the prosecution must prove sanity beyond a reasonable doubt. It contained other matter, however, which could have negated the effect of the instruction as to the Davis rule, or, at least, raised confusion as to it.

The instruction on the fourth possible verdict begins with the following statement:

"It is claimed in behalf of the defendant * * * that he was insane at the time of the commission of the act. *If you find this to be the case,* then your verdict should be a verdict of 'Not guilty because of insanity.'" [Emphasis supplied.]

Concluding the instruction on the fourth verdict and going on to the fifth, the verdict of "not guilty," the judge stated:

"To repeat: You may return the fourth verdict, namely, not guilty because of insanity, *if you find* in the circumstances *that the defendant* at the time the crime was committed *was either suffering from a mental disease * * * or from a mental defect, * * * and that there was a causal connection between such mental defect or such mental disease and the commission of the crime with which the defendant is charged.*

"There is a fifth possible verdict in this case. It is a verdict of not guilty. You may return that verdict *if you find that the Government has failed to establish from the evidence beyond a reasonable doubt that the defendant committed the offense with which he is charged.*" [Emphasis supplied.]

There is danger that the jury might infer from the contrasting treatment of the two possible verdicts that, in order to acquit by reason of insanity, it would be necessary for them to reach the affirmative conclusions that Wright was insane at the time of the crime and that the act was the product of the illness.

2. As we have noted, the judge gave the jury the sample Durham instruction on the meaning of insanity. After several hours of deliberation one juror asked for further instruction as to whether "in determining sanity * * * any other consideration * * * might be included * * * than dementia or schizophrenia." The judge replied:

"The Court has read the instructions to you. The Court is not going to amplify the instructions. They are lenghty. They are inclusive. The Court feels they are adequate to enable you to return a verdict in this case. So that the answer to the question that you have asked is answered in the way the Court has just answered it.

"It will be necessary for the jury to reach its determination on the evidence and on the instructions which the Court has given you."

A defense request embodying the juror's request for explanation was also denied.

The refusal to answer the juror's question and the denial of the requested instruction constitute reversible error. The sample Durham charge was not meant to be and is not an inflexible directive to be followed by rote. Douglas v. United States, 1956, 99 U.S.App. D.C. 232, 238, 239 F.2d 52, 58, note 10. It sketches the substance of what the judge "should in some way convey to the jury." 94 U.S.App.D.C. at page 241, 214 F.2d at page 875. Where, as here, the need for more appears, it is the duty of the judge to fill in the sketch, as may be appropriate on the basis of the evidence, to provide the jury with light and guidance in the performance of its difficult task.

The terms "disease" and "defect" are not so self-explanatory and our definition of them in Durham is not so definitive as to make elucidation always superfluous. Whether elucidation is necessary and, if so, whether failure to give it is prejudicial error depend upon the evidence which the jury has heard. In this case there was testimony from nine psychiatrists that Wright, at various times, was afflicted by schizophrenia (or dementia

praecox—an older term for the same disease). Some of this testimony dwelt at such length and with such detail upon the nature of that disease that it would not be surprising if a juror understood that schizophrenia was the only form of mental disease amounting to "insanity." Where there is evidence to support a finding that the accused suffered from some other form of mental disease or from a mental defect the jury should be instructed that it may make that finding, especially when a juror has indicated by a question that the general instruction, as given, is ambiguous, confusing or inadequate. Here, in addition to the evidence of schizophrenia, there was testimony from two doctors that Wright was a victim of "psychomotor epilepsy" or "psychomotor seizures" at the time of the shooting. There was also evidence that tests had shown Wright was a moron. In view of this evidence and the juror's question, merely reciting the sample Durham instruction did not accomplish what we said in that case was the function of the instruction—to "provide the jury with guides for determining whether the accused can be held criminally responsible." 94 U.S.App.D.C. at page 241, 214 F.2d at page 875.

3. Two of the psychiatrists who testified that Wright had been mentally ill at the time of the shooting said further that, by reason of his illness, he had been unable to distinguish right from wrong. The court refused a defense request to instruct the jury to acquit Wright by reason of insanity if it found that he had been unable to distinguish between right and wrong.

■ The instruction should have been given. While capacity to distinguish right from wrong is no longer *the* earmark of legal *sanity*, the lack of that capacity is *one* of the earmarks of legal *insanity*. Durham v. United States, 94 U.S.App.D.C. at page 242, 214 F.2d at page 876. When evidence of such lack of capacity exists, "a trial court should permit the jury to consider [it] in resolving the ultimate issue 'whether the accused acted because of a mental disorder,'" Douglas v. United States, 99 U.S.App.D.C. at page 238, 239 F.2d at page 58; "the jury should be instructed that it is relevant in determining whether the unlawful act was the product of mental disease or defect." Stewart v. United States, 1947, 101 U.S.App.D.C. 51, 247 F.2d 42, 44.

4. The jury was instructed, in terms of the sample Durham instruction, that, even if Wright was suffering from a mental disease or defect at the time of the shooting, it could still convict him "if there was no causal connection between such mental abnormality and the act." The court refused a defense request to explain "causal connection" as used in the charge.

■ When we say that one event causes another, do we mean it is *a* cause of it, or the *principal* cause, or the *exclusive* cause? When a jury is told that it may convict the accused if it finds that, though he was mentally ill when he committed the act, the illness did not cause the act, may it convict if it finds that the illness was *one of the causes* of the act, but not the *exclusive cause?* The answers to these questions are to be found in Carter v. United States, 101 U.S.App.D.C. at page ——, 252 F.2d at page 614; and Douglas v. United States, 1956, 99 U.S.App.D.C. 232, 239, 239 F.2d 52, 59. We said in Carter:

"When we say the defense of insanity requires that the act be a 'product of' a disease, we do not mean that it must be a direct emission, or a proximate creation, or an immediate issue of the disease in the sense, for example, of Hadfield's delusion that the Almighty had directed him to shoot George III. * * *

" * * * There must be a relationship between the disease and the act, and that relationship, whatever it may be in degree, must be, as we have already said, critical in its effect in respect to the act. By 'critical' we mean decisive, determinative,

causal; we mean to convey the idea inherent in the phrases 'because of', 'except for', 'without which', 'but for', 'effect of', 'result of', 'causative factor'; the disease made the effective or decisive difference between doing and not doing the act. The short phrases 'product of' and "causal connection' are not intended to be precise, as though they were chemical formulæ. They mean that the facts concerning the disease and the facts concerning the act are such as to justify reasonably the conclusion that 'But for this disease the act would not have been committed.' " [101 U.S.App.D.C. at page ——, 252 F.2d at page 616.]

Similarly, in Douglas, we said the accused should be discharged of responsibility if at the time of the crime he had a mental illness "without which [the crime] would not have occurred."

■■ On the evidence in the record the jury could have found two things to be simultaneously true: (1) that Wright would not have shot his wife but for his mental illness; and (2) that Wright might have had a "rational" motive for his act, i. e., the suspicions and passions engendered by the dissension between them which culminated in their separation. Without an explanation of "causal connection," the jury may have erroneously concluded that, though the shooting would not have occurred but for Wright's illness, the principal cause of the shooting was the rational one, i. e., his ill-feeling against his wife, and that, therefore, he ought to be held accountable for his act. While an instruction that conviction depends on "causal connection" may generally be sufficiently accurate, a defense request for an explanatory instruction should not be refused when there is latent ambiguity in the case.

### The Admission of the Confession

The court refused Wright's request for a preliminary hearing on the question of the voluntariness of his confession and submitted the question to the jury. This was error.

To substantiate a defendant's contention that his confession was involuntary, it is generally necessary for him to take the stand. Since it is a matter of course that the defendant should be allowed to testify to the involuntariness of his confession without waiving his privilege against self-incrimination, 3 Wigmore, Evidence 345 (3d Ed. 1940), it follows that, when he requests it, he should be given a hearing without the jury.

■■ The majority rule is that the question of voluntariness is for the court alone to decide. Id., § 861. In this jurisdiction, however, by "law and practice," the court first holds a preliminary hearing for the purpose of determining whether there is evidence from which the jury could properly conclude that the confession was voluntary. If the court concludes there is no such evidence, it must exclude the confession; but if it finds there is evidence on the basis of which it might be held to be voluntary, then the question of voluntariness is submitted to the jury. McAffee v. United States, 1939, 70 App.D.C. 142, 105 F.2d 21; Id., 72 App.D.C. 60, 111 F.2d 199, certiorari denied, 1940, 310 U.S. 643, 60 S.Ct. 1094, 84 L.Ed. 1410; Catoe v. United States, 1942, 76 U.S.App.D.C. 292, 131 F.2d 16; cf. Ziang Sun Wan v. United States, 1924, 266 U.S. 1, 45 S.Ct. 1, 69 L.Ed. 131. The trial judge, in refusing to hold a preliminary hearing, said a rule requiring it would make for cumbersome proceedings. Be that as it may,[5] the rule does require it and the judge was wrong to refuse.

We held in Tyler v. United States, 1951, 90 U.S.App.D.C. 2, 6, 193 F.2d 24, 28, certiorari denied, 1952, 343 U.S. 908,

---

5. See Catoe v. United States, 76 U.S. App.D.C. at page 294, 131 F.2d at page 18, where "as much or more testimony was taken [at the preliminary hearing], in the absence of the jury, as was subsequently taken before the jury."

72 S.Ct. 639, 96 L.Ed. 1326, that, where a preliminary hearing was omitted because of a misunderstanding between court and counsel and the evidence showed there was ample basis for a conclusion of voluntariness, it was not prejudicial error to have submitted the question to the jury without preliminary hearing. We did not suggest, as the Government argues here, that the McAffee rule was to be disregarded. That rule is to be followed when a contested confession is offered. The duty it places on the trial judge is mandatory.

Reversed and remanded.

BURGER, Circuit Judge, concurs in the result only.

WILBUR K. MILLER, Circuit Judge, with whom DANAHER and BASTIAN, Circuit Judges, concur, dissenting: In considering this case, we should not lose sight of what happened on the morning of June 20, 1951. About 7:00 a. m. Clarence L. Wright met his estranged wife on a street corner near Georgetown University in the District of Columbia and, in the presence of eyewitnesses, calmly and deliberately shot her several times, inflicting wounds from which she died a few days later. Apprehended almost immediately, he at once admitted his guilt to the arresting officer, and later in the morning signed a written confession. Before noon he was presented to a committing magistrate.

Wright has been twice tried for this murder and twice convicted. At both trials the only defense was that he was insane when he killed his wife. Both juries rejected this defense and concluded beyond a reasonable doubt from the evidence before them that he was sane at the time of the murder. The first verdict was set aside by the trial judge, not because of any infirmity in the evidence from which the jurors were convinced Wright was sane when the crime was committed, but because examinations made shortly subsequent to the first trial —and two years after the killing—indicated he was mentally incompetent when the first trial occurred in February, 1953.

The Superintendent of St. Elizabeths notified the Director of the Bureau of Prisons September 21, 1955, that Wright was at that time mentally competent to stand trial and able to consult with counsel and properly assist in his own defense. November 15, 1955, Chief Judge Laws of the District Court entered an order which, after reciting St. Elizabeths' certification of sanity and Wright's statement in open court that he did not object to the Hospital report, "found that the defendant had been restored to mental competency and is presently able to understand the proceedings against him and to properly assist in his own defense," and ordered that he stand trial.

Pursuant to this order, a second trial began December 14, 1955, before Judge McLaughlin and a jury. At its inception, appellant's counsel said to the presiding judge, "It will be our defense, Your Honor, that the man was of unsound mind at the time the offense was committed but is of sound mind as of now." As a consequence of this defense tactic, most of the evidence at the trial dealt with the question whether Wright was insane when he killed his wife; for the fact that he had killed her was quickly proved without contradiction. The jury returned a verdict of murder in the second degree, thus finding he was sane when he committed the crime.

A majority of the court reverse the conviction and remand the case to the District Court with instructions "to enter a judgment of [not guilty] by reason of insanity notwithstanding the verdict," unless the Government should request a new trial. This is a drastic exercise of appellate authority. The majority attempt to justify it by saying in their opinion, "Reasonable jurymen could not conclude beyond a reasonable doubt" from the evidence introduced "that Wright was sane at the time of the shooting."

Yet the testimony of the only witnesses who had observed Wright on the day of

the murder was that he was then of sound mind. These witnesses were laymen, to be sure, but their testimony was indisputably admissible; and the verdict shows it was convincing as well. Apparently the majority view is that the testimony of five psychiatrists who thought Wright was insane when he killed his wife so overwhelmed the contrary testimony of the lay witnesses that the jurors were unreasonable in not accepting their opinion. The majority say there was no conflict in the medical testimony; even if that were correct, its clash with the lay testimony would nevertheless form an issue of fact for the jury.

In fact, however, there were sharp conflicts in the medical testimony, which impaired its probative value. Eleven psychiatrists, who had examined Wright at various times from about three months to as long as four and one-half years after the crime, testified before the jury. Only five of them thought he was insane when he killed his wife, and only one of the five thought the criminal act was the "product" of the postulated insanity. The other six psychiatrists, who had had equal opportunity for observation, said they could not diagnose Wright's mental condition as of the morning of the murder.

The majority say their inability to do so "does not detract from the testimony of the doctors who were able to state an opinion that he was ill" at the time of the killing. I cannot follow this reasoning. To my mind, the fact that six of the eleven psychiatrists could not diagnose Wright's mentality as of June 20, 1951, on the basis of examinations made long thereafter, while from similar data the other five professed to be able to do so, demonstrates a serious conflict in the medical testimony. It doubtless caused the jury to wonder how, and to question whether, the five could actually do what the other six equally qualified experts said they could not do.

There were more conflicts in the medical testimony. Drs. Perretti and Gilbert, who made their examinations about the same time—some three months after the crime,—did not agree. Both thought him then insane; but Perretti could say he thought Wright was mentally diseased on the murder date and Gilbert could not make that statement. Drs. Cavanaugh and Todd, who examined in 1953, and Drs. Cushard, Epstein and Tartaglino, who examined in 1954, found Wright mentally deficient when examined, but could not say the condition had existed on the morning of the murder. Despite these opinions which seem to comport with reason, Drs. Miller and Odenwald, who examined Wright for the first time in December, 1955, and found him then sane, were willing to say they thought he was insane in June, 1951.[1]

It seems to me that, instead of being without conflict, the medical testimony in its totality was confused and contradictory, calculated to cause the jury to give little credence to the testimony of the five doctors who claimed rather remarkable power of "antegnosis"—if I may coin a word to describe their action in forming an opinion as to a condition in the past. About all the medical testimony in its entirety proved to a certainty is that psychiatry is not an exact science.

Added to the weakness of the testimony tending to show mental illness on the day of the murder is the striking fact that of the five "antegnosticians" only one ventured to say the murder was the "product" of the supposed insanity—an element without which the testimony of mental infirmity had little relevance.

There is still another consideration which looms large here. In resolving the issue of fact submitted to them, the jurors had the right and the duty to determine the credibility of the witnesses, both lay and medical, and to reject testimony which they considered unworthy of

---

[1]. Although Dr. Odenwald thought Wright was schizophrenic in June, 1951, he said there was not necessarily a causal connection between the condition and the crime.

belief. They observed the demeanor and conduct of the five "antegnosticians" on the witness stand and were in a much better position than this court is to decide whether their statements should be accepted at face value. The verdict shows their decision. They did not choose to believe the doubtful and discredited testimony of Drs. Miller and Odenwald and the other three who shared with them the opinion that the appellant was mentally diseased on the day of the murder. It should also be noted that the unanimous expert opinion that Wright was of sound mind in December, 1955, indicates that the disturbed mentality some discerned in 1953 and 1954 was not a permanent condition.

As weak as the evidence of insanity was, there was unquestionably a conflict of testimony on the single crucial question whether Wright was mentally responsible on the morning of the crime. The evidence therefore presented a typical jury question which conceivably could have been decided either way. The decision was for the jury, however, and not for us;[2] we have no right whatever to substitute our judgment for that of the jury when there is evidence to support its verdict, no matter what evidence there may have been to the contrary and no matter how much we may wish to decide the question the other way. Cf. Bradley v. United States, 1957, 101 U.S.App.D.C. —, 249 F.2d 922. The reversal of Wright's conviction is, I think, arbitrary and unjustifiable.

2. The Durham opinion recognizes this. It suggests the jury be told, "These questions must be determined by you from the facts which you find to be fairly deducible from the testimony and the evidence in this case." 94 U.S.App.D.C. at page 241, 214 F.2d at page 875. The opinion continues thus: "The questions of fact under the test we now lay down are as capable of determination by the jury as, for example, the questions juries must determine upon a claim of total disability under a policy of insurance where the state of medical knowledge concerning the disease involved, and its effects, is obscure or in conflict," and later adds,

For the reasons stated I cannot concur in the majority's disposition of the case, which seems to me to be a usurpation of the jury's function, and another example of what I regard as an alarming judicial tendency to magnify the rights of criminals at the expense of the public interest in the strict enforcement of the criminal laws, particularly in cases where the defense of insanity is interposed. This reversal allows a murderer to go unpunished and, in all probability, will result in his almost immediate release from any custodial restraint.

Having reversed solely on the ground that reasonable jurors could not have believed from the evidence beyond a reasonable doubt that Wright was sane when he committed the crime, the majority proceed to express in four numbered passages their views on other matters, from all of which I dissent.

I draw attention first to passage No. 1 therein, which has to do with the judge's charge to the jury, which was in exact accord with the Durham case. Nevertheless the majority make the following comment concerning it, which I quote from their opinion:

"  *   *   * There is danger that the jury might infer from the contrasting treatment of the two possible verdicts that, in order to acquit by reason of insanity, it would be necessary for them to reach the affirmative conclusions that Wright was insane at the time of the crime and that the act was the product of the illness."

"Finally, in leaving the determination of the ultimate question of fact to the jury, we permit it to perform its traditional function which, as we said in Holloway, is to apply 'our inherited ideas of moral responsibility to individuals prosecuted for crime  *   *   *.' [Holloway v. U. S., 80 U.S.App.D.C. at page 5, 148 F.2d at page 667]. Juries will continue to make moral judgments, still operating under the fundamental precept that 'Our collective conscience does not allow punishment where it cannot impose blame.' [80 U.S.App.D.C. at pages 4–5, 148 F.2d at pages 666–667.]"

This means that the majority think there is danger that the jury might infer from the charge that Wright had the burden of proving he was insane at the time of the crime when in fact the Government had the burden of proving sanity after some evidence of insanity had been brought forward. The danger is fanciful; the majority's apprehension probably springs from their failure carefully to examine the complete charge. Judge McLaughlin made it quite clear that in the circumstances the burden was on the Government to prove sanity beyond a reasonable doubt. For example, he said to the jury:

"You are instructed that if you, the jury, believe beyond a reasonable doubt that the defendant Clarence L. Wright committed the criminal act with which he is charged, and was not suffering from a mental disease or from a mental defect at the time he committed the said criminal act, you may find him guilty."

and again he said, using almost *verbatim* the language of the Durham case:

"You are further instructed that unless you believe beyond a reasonable doubt either that the defendant was not suffering from a disease or mental condition, or that the act was not the product of any mental disease or mental defect, you must find the accused not guilty because of insanity."

to which he later added this:

"Now, to summarize: If you find that the Government has established beyond a reasonable doubt all of the essential elements of the crime as I have delineated them to you, and if you also find beyond a reasonable doubt that defendant was not suffering from a mental disease or a defective mental condition at the time the criminal act was committed, then you may find the defendant guilty."

Finally Judge McLaughlin said this to the jury:

"Ladies and gentlemen of the jury, every person is presumed to be sane until the contrary appears. This presumption is founded on human experience. This presumption does not mean, however, that the burden of proof is on the defendant to prove insanity. If the defendant offers any evidence that the defendant was legally insane at the time of the deed, the presumption of sanity vanishes from the case. The burden is then on the prosecution, the Government, to establish the sanity of the defendant.

"In other words, on the issue of insanity, or of mental incapacity, as it is otherwise called, just as on every other issue in the case, the burden of proof is on the prosecution, and that burden must be sustained beyond a reasonable doubt."

In view of the carefully worded and repeated admonitions to the jury, it seems to me there is no basis whatever for the majority's apprehension that the jury might infer from the instructions that the burden of proof was on the defendant.

It should be pointed out in this connection that an unsupported defense of insanity does not cast upon the Government the burden of showing sanity. Insanity is never presumed and may not be assumed by the jury without proof when it is merely suggested. There is, however, a legal presumption of sanity which obviates the necessity of proving it, unless and until the defendant produces proof tending affirmatively to show insanity. When that is done, the presumption of sanity is rebutted and dispelled and the Government must then, in order to convict, bring convincing countervailing proof. Thus there can be no issue for the jury concerning insanity unless there is some testimony showing its existence. It follows that a verdict of acquittal for insanity cannot be returned in the absence of evidence tending to prove insanity. Such a verdict cannot result from simple default—from the Government's failure to prove sanity to the jury's satisfaction—because the issue is

never submitted in the absence of evidence tending to show insanity.

On the basis of the foregoing, which I think must be conceded, I suggest that the jury should not be told it may acquit if it negatively concludes—without evidence—that the defendant was insane simply because it thinks sanity was not sufficiently shown.

The Durham rule, whatever its imperfections,[3] at least requires the jury to find the existence of a mental malady which caused the crime before acquitting for insanity.[4] It is much to be preferred to a looser rule.

The action of the court in this case disturbs me for another reason to which I have already made reference: it is an exercise of appellate review of a jury's factual finding reached on conflicting evidence but supported by substantial proof. Traditionally such a finding cannot be disturbed on appeal. I suggest that stable rules of law and consistent application of them are essential for the guidance of bench and bar in trial practice and procedure. Instability and inconsistency result when an appellate court retries each case on a new and different standard and substitutes its own determination for that of the jury concerning a defendant's mental status and its causative effect.

I turn next to passage No. 2 in the majority opinion, from which I quote the following:

" * * * After several hours of deliberation one juror asked for further instruction as to whether 'in determining sanity * * * any other consideration * * * might be included * * * than dementia or schizophrenia.' The judge replied:

" 'The Court has read the instructions to you. The Court is not going to amplify the instructions. They are lengthy. They are inclusive. The Court feels they are adequate to enable you to return a verdict in this case. So that the answer to the question that you have asked is answered in the way the Court has just answered it.

" 'It will be necessary for the jury to reach its determination on the evidence and on the instructions which the Court has given you.'

"A defense request embodying the juror's request for explanation was also denied.

"The refusal to answer the juror's question and the denial of the requested instruction constitute reversible error. * * * *"

I disagree. I think Judge McLaughlin followed the correct course in refusing to answer the question and in denying

---

3. The Durham case has been pressed upon and rejected by the United States Court of Military Appeals, the Fifth and Ninth Circuits, and the highest courts of Maryland, Montana, California, Indiana, Vermont and Washington. United States v. Kunak, 5 USCMA 346 (1954); Howard v. United States, 5 Cir., 1956, 232 F.2d 274; Andersen v. United States, 9 Cir., 1956, 237 F.2d 118; Thomas v. State, 1955, 206 Md. 575, 112 A.2d 913; State v. Kitchens, 1955, 129 Mont. 331, 286 P.2d 1079; People v. Ryan, 1956, 140 Cal.App.2d 412, 295 P.2d 496; Flowers v. State, Ind.1956, 139 N.E.2d 185; State v. Goyet, Vt.1957, 132 A.2d 623; State v. Collins, Wash.1957, 314 P.2d 660. Cf. State v. White, 58 N.M. 324, 270 P.2d 727, decided by the Supreme Court of New Mexico May 12, 1954, a few weeks before the Durham decision.

As far as I know the Durham rule prevails nowhere else except in New Hampshire, its birthplace.

4. I quote the following from the Durham opinion, 94 U.S.App.D.C. at page 241, 214 F.2d at page 875:

" * * * But under the rule now announced, any instruction should in some way convey to the jury the sense and substance of the following: If you the jury believe beyond a reasonable doubt that the accused was not suffering from a diseased or defective mental condition at the time he committed the criminal act charged, you may find him guilty. If you believe he was suffering from a diseased or defective mental condition when he committed the act, but believe beyond a reasonable doubt that the act was not the product of such mental abnormality, you may find him guilty. * * * *"

the requested instruction. He had adequately covered the matter in his charge, in the course of which he referred several times to "a mental disease or mental defect" and again to "any mental disease or mental defect."

Thus it clearly appears that the learned trial judge had not limited the jury to dementia or schizophrenia in determining insanity. The inquiring juror could have found in the applicable portion of the charge the answer to his own question: the all-embracive terms "any mental disease or mental defect" are not confined to dementia or schizophrenia. Moreover, further discussion of the subject by the presiding judge might have confused the other jurors who apparently understood the simple language used, and might somehow have run afoul of the Durham rule. It seems to me that the refusal to answer what in reality was a silly question cannot logically be called reversible error.

The majority further say the trial judge erred in refusing a defense request to explain "causal connection" as used in the charge. In view of the ample and instructive charge he had already given, I think Judge McLaughlin was wise in declining to define those two simple English words which are self-explanatory and easily understood without elaboration. An attempt to explain them in the manner indicated by the majority—which I am confident average jurors would find puzzling indeed—would have served only to confuse the jury.

For these reasons I think the majority opinion further complicates a complex and difficult problem, and particularly that the sections numbered 3 and 4 will add to the confusion already engendered by the Durham rule, as given *ad hoc* interpretations in subsequent opinions of this court. It is made more vague by what the majority say here. I am sure the District Court judges, who have heretofore found it difficult to understand and apply the rule, will now find it even more difficult.

I would affirm.